Ruffin, C. J.
 

 The conduct of those gentlemen, who have brought up this question, seems to have been fair and honorable throughout; for they have not covered their refusal to license this man under any unfounded suggestion of personal objections, but, with the candor of persons conscious of an intention to do right, they put the truth upon their own record, with the view, if they were wrong, that there should be no improper impediment to any redress the law would afford. They have returned the same matter in substance to the alternative mandamus, in order that the question in its most general form might obtain the opinion of the court of the last resort, as to their powers and duties, with the view, assuredly, to their due exercise and performance, when known. For the sake, too, of the character of the law, as being every where equal and uniform in its administration, it is fit this case should have been brought here, that an end may be put to a conflict of opinion and action on this subject among this
 
 *320
 
 respected body of magistrates in different parts of this State, ^or» while, *n the greater part of the State, the justices license tipling houses, according to the demand by those whodiscreet-resort to them, and according to the probability of an inter* ference with each other, so that none may yield a livelihood, yet we learn, that, in some few counties, they consider themselves bound to license every one, who comes with the requisite qualifications, and that in some few others, of which Guil-ford seems to be one, they hold that they are not bound to license any person, but may refuse every one, without giving any reason for the refusal but their own will, or their opinion, that it is mischievous to allow of the sale of spirituous liquors by the small measure.
 

 Upon the proper construction of the statute, the court entertains no doubt. The two opposite extremes — that there is an absolute right in every person to follow the calling of a retailer, if he chooses, and that the justices are bound to license him, with only the condition that he be free, white, and of a good moral character; and secondly, that there is an
 
 absolute
 
 and arbitrary authority in the justices to refuse all persons, however unexceptionable in their lives,and however much such accommodations may be desired by the public or any considerable portion of the public for their convenient refreshment; are, like most extremes, both erroneous, as it seems to us, and founded on a mistake of the intention of the legislature. We cannot say, that they are equally mischievous; for we should, if acting as legislators, much prefer to allow no tipling house, rather than multiply them to the enormous extent of giving a license to every one, who could make out to find two men who would give him a good character. But we think the Legislature meant neither extreme, but the mean between them.
 

 The.claim of the justices of an unlimited and uncontrolable power to grant or to refuse a license, is- founded on the idea> that the act confers on them a discretion ; and then they hold that discretion, in its nature, is the liberty of those to whom it is confined, of acting according to their personal pleasure. It
 
 *321
 
 is to be noted, that the part of the act, which relates to retailers, has not the word “discretion ” in it. But for the present we will assume it to be 'meant; and such is our opinion. Yet it remains to be considered, what kind of discretion is conferred : a partial, absolute, and arbitrary personal discretion to refuse
 
 all
 
 applications, or a legal, regulated, and reasonable discretion to grant the applications of such persons as the legislature declares fit to possess the privilege, as far as the necessity or convenience of the public require such places, as accommodations allowed by the legislature, and beyond
 
 that
 
 to refuse them? The very stating of the questions furnishes their proper answer. The law abhors absolute power and arbitrary discretion, and never admits them but from overruling necessity. And there is no arbitrary power, that would be felt to be more unreasonably despotic and galling than that, under which a small body of Inferior Court magistracy should undertake, upon their mere will, without any plain mandate from the law-making power, to set up their taste and habits as to meat, drink, or apparel, as the standard for regulating those of the people at large. ■■ For ages past sumptuary laws have been abandoned. The legislature does not affect to assert that policy. On the contrary, the legislature allows the indulgence of the inclinations of individuals in the use or disuse of spirituous liquors, as of other articles of sustenance; and for those, who choose to use them, it further allows of the vending of them in such quantities and at such places, as may be suitable to their convenience. The toleration of ordinaries and tipling houses is conclusive, that the legislature does not deem them evils in themselves, or, if so, that they are deémed necessary evils. They are not against the legislative policy; and that is the. only thing courts can look at, as the public policy. By the legislature, therefore, they are permitted, author-ised, and approved, at least, to some extent. It requires but little thought to perceive that it could not be otherwise. In the act under consideration, Rev. St. c. 82, the first part is a regulation of ordinaries, and it is express, that licenses for them may be ordered “ at the discretion of the court.” Now,
 
 *322
 
 every one sees that the legislature could not but know, that ^ie public necessities absolutely require ordinaries or inns, for the accommodation of wayfaring people, those called from homo by private business or public duty, who
 
 must
 
 have some fit place for lodging, and where they may, for a reasonable price and without injurious delay, procure their accustomed refreshment of meat and drink, and then proceed on their business. Can any body believe, that, in giving the justices a discretion in licensing ordinaries, the intention of the law was, that they might, in the form of refusing all licenses, arbitrarily
 
 suppress all
 
 such needful establishments, leaving the traveller to sleep out of doors, and to buy and cook his victuals as he Could? If not, then that shews the kind of discretion that is conferred iu such cases. It is a reasonable, salutary discretion ; to be exercised, as appears in the act, by not licensing any person, who is grossly immoral, or in such poor circumstances that he cannot, probably, keep such a house as will accommodate the public, and, as we think from the nature of the subject, by also not licensing more ordinaries than the custom or probable number of guests will justify, so that they shall not interfere with and break each other down, and, for the want of good company the keepers be driven, for a livelihood, to entice the unwary into idle courses, and entertain the dissolute in their houses, not maintaining good order and rule therein. Although keepers of ordinaries are not obliged by their bond to provide liquor for travellers, as they are diet and lodging, yet there is no doubt they were expected to do so, as a matter of course, to subserve their own interest, and, moreover, the act of 1755, requires the justices once a year or oftener to rate their prices of liquor, diet, lodging,and corn, fodder and pasturage for horses. We say, then,.that it is impossible the legislature meant to trust any body of men with the uncon-trolable power of putting down all such accommodations. The people, for instance, are called, not only from all parts of Guilford county, but from different parts of the State to the town of Greensborough six times a year, in attendance upon the courts of that county ; and did the legislature intend they
 
 *323
 
 should have no place of rest, recreation or refreshment, or to put it in the power of the justices of the county absolutely to deny them such accommodations ? And here it may be proper to notice an argument contained in the return — for we do not understand it literally to state, as a fact, that the relator’s shop is at the door of a church or a school house. But it is asked, whether the law obliges the justices to license an ordinary or tippling house at the door of a church or academy? We answer certainly not; for, although not necessarily evil or disorderly, yet, probably, all sorts of persons would be drawn there in such crowds as would disturb a congregation in their devotions, or draw off the boys from thei r books, and lead them into disorder, when of an age at which they have neither the capacity nor the right to judge or act for themselves. But, on the other hand, it is certainly not a reason, why an ordinary should not be licensed in a town, that there are a church and a school in the town. It is to be hoped, that there are a church and a school in every town, at least in every one of much size; and their existence there, instead of increasing the ills to which ordinaries tend, are the very best means of correcting them. If the place be of sufficient population to maintain a church and a school, it will commonly be of sufficient extent to allow of places of accommodation in situations, not so contiguous to either church or school, as to interfere with the proper avocations at either. There is no doubt but the young may be led astray at such places. But the legislature has not, for that reason, thought proper to suppress them altogether, because they are needful to many citizens ; but relies on the authority, diligence, and discipline of the parents and teachers of the young, and of the pastors of the people, to restrain them from %e abuse of such establishments, and on the punishment inflicted by law for actual excesses and disorders.
 

 Precisely of the same character are the powers and duties of justices in licensing persons to retail, without keeping ordinaries. There is no distinction in the act, supposing the discretion as to ordinaries to extend also to retailing. Unless it does, there is an end of this pretension of the justices; for, instead
 
 *324
 
 of their having the arbitrary power to refuse all licenses, the c't'zeri wou^ have the absolute right to a. license, if of good character. But we admit, the license rests in the discretion of the justices; yet we say, it is a discretion of the same nature ancj t0 be eXercised on the same grounds and to the same extent, as in the case of ordinaries. It is not arbitrary, but must have some reason for its exercise. It is not a case, in which
 
 voluntas stat pro rations.
 
 One may act on that maxim in his private affairs; but, for one acting under public authority, and as a minister of the law, it is no answer to the citizen, to the community, or to the legislature. It is said, there is a great difference between the utility of places for repose, and the supply offood, and of tippling shops; for the former are requisite for the comfort and subsistence of the guests, while the latter are often so abused, that it is a kindness to the people to suppress them. The answer is, it may be so ; but it is for the legislature exclusively to determine it. As the legislature allows of ordinaries for the accommodation of travellers in all their wants, so it authorises, and, in effect, directs that there shall be places of convenient resort for people in humble circumstances to assemble for business, conversation, and refreshment, if they choose. Because persons may not be able to keep house, or lay in large supplies, the law did not intend to deprive them of the social enjoyments that are usual among men; and, therefore, it provides places for their gathering, and for the sale of the accustomed liquors in such quantities as are suitable to the occasions and the means of the people, who generally resort thither. That there may be as little prejudice to those persons as possible, and as little disturbance of the public peace, the legislature established such guards as to it seemed meet, by requiring an annual license from seven justices upon the annual proof of a good moral character. Now, it is not for the justices to say, that the legislature has guarded the public morals inadequately, and improperly allows a nuisance, and, therefore, that they will step forward to supply the short-coming of the legislature, and, contrary to the intent of the legislature, suppress such accommodations altogether.
 
 *325
 
 That would be not only to make the law instead of administering it, but to make a law in opposition to the one enacted by the legislature. The first restraint upon retailing by all who choose, was by the act of 1825 ; which requires a license from seven justices, upon proof of good character. Under that act the justices seem to have gone beyond the intention of the legislature, in too liberally licensing improper persons, including, it may be inferred, free negroes. For in 1828, they passed “an act to
 
 restrain
 
 the justices of the county courts in granting licenses to retail spirituous liquors ” ; which alters the act of 1S25 in two particulars only — the one, that none but free white persons should be licensed; and the other, that the good moral character should be shown by at least two witnesses of known respectability, to whom the character of the applicant had been known for at least one year. It is clear, therefore, from these acts, that the practical evil apprehended by the legislature was, that licenses would be granted to irresponsible and loose persons, and that the main object was to prevent that evil. But the legislature did not intend, of themselves, to put down the sale of spirituous liquors, and still less did they intend that the justices should do it, or expect that they would ever think of doing it. For the scope of the legislature is to guard against the opposite error of licensing unfit persons. Upon the whole, then, we conclude, that the justices have not, under their discretion to regulate the retailing ofspiritous liquors by granting licenses, the arbitrary power of prohibition. They ought not to have it. No body of men ought to possess it, that is inferior to that body which can make, modify, and abrogate the law at their pleasure, and through which the general popular will propagates and exhibits itself. There are good persons, who think it would be conducive to the happiness of men to refrain from the use of spirituous drinks ; and no one can dispute the shocking evils often produced by the excessive use of them. Therefore, it is very fit, that benevolent persons, who entertain that opinion, should by persuasion, example, forming associations, and other moral means, endeavor to induce men to renounce it; and, in that
 
 *326
 
 all may wish them success, however much many may despair ^ul' ^lat; *s veiY different from an attempt by a court ar. bitrarily, and without the injunction of the legislature, to cona-Pel mankind to desist from even the moderate and accustomed use 0f j(.; as an enjoyment of life, by suppressing all places for the convenient sale of it. However much we may desire to promote the virtue of temperance — and it is, certainly, a noble object of Christian benevolence — we cannot use as a means to that end, even if it were likely to effect, it, a discretionary power conferred by the law for a purpose totally different. The justices cannot convert a discretion to refuse a license to unfit persons, or, after enough have been already granted, to refuse further applications, into an arbitrary discretion and despotic resolution to grant a license to no person under any circumstances.
 

 We are not without judicial precedents as to the proper construction of statutes, vesting justices with discretionary powers, and, indeed, with this very discretion of licensing tippling houses. The statute, 5 & 6 Ed. 6, c. 25, recites that “for-asmuch as intolerable hurts and troubles to the commonwealth of the realm do daily grow and increase through such abuses as are used in ale houses and tippling houses,” enacts that none shall keep such houses but such as shall be allowed in open sessions of the peace, or by two justices, as by their discretion shall be thought necessary and convenient; and that the said justices “ may put down the selling of ale or beer in any ale house or tippling house, where they shall think it meet and convenient.” Now, before that act, all might in England keep a tippling house, as here, before 1825, for it was a means of livelihood which every one was free to follow. And under the act it was held, that the discretion vested in the two justices, was so far personal and peremptory, that no appeal would lie from them to the sessions;
 
 Stephens
 
 v. Watson, 1 Salk. 45. And a mandamus has since been often refused, as we shall have occasion hereafter to state more particularly. Yet, it was held, notwithstanding the express grant of a discretion to the justices, that they had not the arbitrary discre-
 
 *327
 
 cretion of refusing an applicant. In
 
 Young and Pitts' case,
 
 1 Bur. 556, upon an application for an information against justices for refusing a license, the court said, “that it must not be permitted to them to exercise an arbitrary and uncontrolled power over
 
 the
 
 rights of the people; that if they had no
 
 reasonable
 
 objection against the applicant, they
 
 ought
 
 to license him, and if they had, they ought to give it.” LoRd Mansfield disclaimed any power to review the reasons of the justices by way of
 
 appeal
 
 from their
 
 judgment,
 
 (in the particular case) or overruling the discretion intrusted to them; yet held, that if they were partially, maliciously, or corruptly influenced in the
 
 exercise
 
 of their discretion, and
 
 abused
 
 the trust reposed in them, they were liable to prosecution by information, indictment, and, possibly, even by action. It is-true, in that case the rule for an information was discharged, but it was because the justices had exercised their discretion honestly and likewise correctly, as regarded the fitness of the person, and the necessity of his ale house, there being one already in a small place. But the principle is clearly declared, that the discretion of the justices is not merely personal and arbitrary. And in the subsequent cases,
 
 Rex
 
 v.
 
 Williams,
 
 and
 
 Rex
 
 v.
 
 Davis,
 
 3 Bur. 1317, informations were sustained against justices, for refusing to license persons, because they would not vote in an election as the justices wished, not merely for refusing the license, which was in their sound discretion, but for the unjust and oppressive abuse of their discretion in refusing for that reason.
 

 So it is clear, as it seems to us, that the justices have not, by the just construction of the law, the arbitrary power of suppressing all places for the retailing of spirituous liquors.
 

 On the other hand, we hold that they are not so entirely without discretion as to be bound to license every'applicant, though he be qualified. It is true, there is no express grant of discretion,
 
 eo nomine,
 
 in the 7th section of the Revised Statute, nor is it to be found in the acts of 1825 and 1828, which are combined in that section. But the very requiring a license, and the presence of so many magistrates at the
 
 *328
 
 granting of it, imports a duty of judging, whether the supply of reta^ers -Is adequate to the accommodation of the public. Not, indeed, upon the arbitrary principle, that the people ought not to be avowed any, but upon the principle of the legislative policy, that they shall have those accommodations according to the demand, the justices really believe, will be made by those of the people, who repair to such places, “ for their relief,” as the statute of Edward expresses it. So, too, there are situations, in which it would be so unseemly, that a tippling house should be set up, that all men would be shocked at one’s being licensed there: as, literally, at a church door or school house, or, even, so near a court house as to incommode the court in the dispatch of business. Besides those considerations, which tend to show that in some cases there must be a reasonable discretion lodged in the justices, the incorporating the acts of 1825 and 1828, with that of 1798, in the Revised Statutes, under .the general title of “an act for regulating ordinaries,” and the different parts of the act
 
 in relation
 
 to the two subjects of ordinaries and retailing, being so completely
 
 in pari
 
 materia, compels us, upon every principle of construction, to carry forward the discretion, expressly given in reference to ordinaries, and apply it to retailing likewise. Why should there be discretion in one case, and not in the other? Immorality of the applicant is equally a positive bar in either case. Then, to what is the discretion directed in respect to ordinaries ? There are but two things, upon which it can be exercised. They are, the place where the ordinary is situate, and the demand and need for it there. A like discretion is requisite as to licensing a retailer; for, in reality, the mischief principally to be apprehended from licensing an ordinary, arises from the retailing at it. Besides, there may he already a sufficient number licensed for the occasions of those, who resort to such places. We, therefore, think the justices have a reasonable discretion to deny a license upon those grounds, as well as for the unfitness of the person.
 

 But we cannot affirm the judgment, although all objection :o the form of proceeding was waived in the Superior Court,
 
 *329
 
 and the justices put their case, upon the single point of their power being absolute. But the consent of parties cannot confer a jurisdiction on the court to proceed in a manner forbidden by the law, more than to decide the matter of right contrary to law. Now, a mandamus lies only for one who has a specific legal right, and is without any other specific remedy. 1 Chitt. Gen’l. Pr. 790.
 
 State
 
 v.
 
 Moore
 
 County, 2 Ired. 430. If, in this case, the sheriif were to refuse to give a license after the court had made an order for it, the redress would be by mandamus, as the specific remedy, as well as by action for the damages; for the party has a positive right to it from’the sheriff. But when we decide, that the justices have a discretion, under circumstances, to refuse a license to the relator, although he be a fit person, we, in effect, decide that he cannot have a mandamus. For it is the nature of a discretion in certain persons, that they are to judge for themselves; and therefore no power can require them to decide in a particular way, or review their decision by way of appeal, or by any proceeding in the nature of an appeal, since the judgment of the justices would not, then, be their own, but that of the court under whose mandate they give it. Therefore, in the case of
 
 Young and
 
 Pitts, the court would not act on a rule
 
 on the
 
 justices to show cause, “ why they should not grant the licensebut the rule was to shew cause*, “ why an information should not be granted againt them for refusing the license.” It has been already noticed, that in the case in Salkeld, it was held, that no appeal lies from the order of justices under the statute of Edward. For the same reason it was held, in
 
 John Giles’ case,
 
 2 Str. 881, that a mandamus to justices togranta license for an ale house would not lie; the court saying, that there never was an instance of such a mandamus, for it was within the discretion of the justices. In
 
 Rex
 
 v. Nottingham, Say. Rep. 217, it was refused, though in the same case, Bur. 561, an information was granted for the gross abuse of the discretion. And more recently, in
 
 Rex
 
 v.
 
 Farmingdon,
 
 4 Dowl. and R. 735, and
 
 Rex
 
 v.
 
 Surrey,
 
 5 Dowl. and R. 308, although the refusal of the license proceeded from a mistake of the jus
 
 *330
 
 tices as to their jurisdiction, a mandamus to rehear the a jipis • cation was refused.
 

 Yet it is not to be supposed, that there is no redress in such case* What redress the party may have by action in a case 0f gross malice towards him, as suggested by Loud Mansfield, it is not our province how to determine. This is not a proceeding of that sort, and it is very clear that these gentlemen were actuated by no ill will towards the relator personally. But the occasion is a fit one to say, that there is no doubt, the justices would be amenable to the law
 
 criminaliter,
 
 by indictment, for obstinately persisting, in refusing to license any person whatever, after being informed of their mistake of the law hitherto, as also for a refusal to license a particular person from corruption, or with a view to oppress him from spite. The cases have already been reverted to, on this point.
 
 Rex
 
 v.
 
 Nottingham, Rex
 
 v.
 
 Young and Pitts, Rex
 
 v.
 
 Williams, and Rex
 
 v.
 
 Davis.
 
 The distinction between the different methods of proceeding, is perfectly intelligible. The mandamus will not lie, because by law the justices, with local knowledge, are to judge for themselves, and the judges of a higher court are not to dictate to them. But the indictment will lie, because, although the law allows the justices to judge for themselves, it requires an
 
 honest
 
 judgment, in
 
 subordination to the law,
 
 and punishes a dishonest one, that is, one given in opposition to the known law. If it be said, these gentlemen really believe, that there ought to be no spirituous liquors retailed, the reply is, that they are not to be guided
 
 in
 
 their decision by their own belief on that point, but they are to found their judgment on what they believe the legislature intends on it; in other words, they are to act on what they believe the law to be, and not what they think it ought to be. It is a criminal perversion of power, to use it for a purpose, for which the legislature did not confer it, and with the view of defeating the end the legislature had in entrusting the power to them. In fine, in this case, it would amount to an attempt by a few individuals, to set up their will against the general sentiments and habits of mankind, and the legislative au«
 
 *331
 
 thority of the country. There are other cases of discretionary power, which stand on the same legal reasons with this, about which there would be no difference of opinion as to the question of criminality or mode of redress. For example, before the act of 1813, the whole subject of roads vested in the discretion of the County Courts; and no appeal laidfrom their decision.
 
 Hawkins
 
 v.
 
 Randolph County,
 
 1 Murph. 118. The subject was placed exclusively in their discretion, because the legislature deemed them the most competent judges what roads were useful, and could be opened and kept in repair by the strength of the county, and supposed, as a matter of course, that they would have the necessary roads laid out and kept up. Now, suppose the justices were, upon some notion of their own, to resolve that they would discontinue all existing roads, and would not establish any others, would it not be plain,
 
 that
 
 was not a sound exercise of the legal discretion, not an honest judgment, but was really setting up an arbitrary discretion of their own in contradiction lo the law. It would be a wilfully wrong exercise of their discretion, which, legally speaking, amounts to malice and corruption in a public officer, and is therefore punishable by indictment. The present is a similar case, for although tippling houses are tar less useful than roads,
 
 yet the legislature intends,
 
 that one shall no more be entirely suppressed than the other, and that those citizens, wUose limited meansdo not enable them to buy spirituous liquors, except by the small measure, or who do not choose to purchase it but as they use it, may have the opportunity of thus buying at convenient seasons and places.
 

 The above observations are not made in reference to any expected action of the gentlemen now before the court, for it is obvious their conduct arose from the belief that they were acting according to law, and from no actual corruption. But they will now know, that they mistook the law ; and if magistrates, fully informed that they have a discretion to regulate a branch of the public police, should perversely abuse their discretion by obstinately resolving not to exercise it at all, or by
 
 *332
 
 exercising it in a way purposely to defeat the legislative inten-^on) or to °PP*ess an individual; such an intentional, and, therefore, corrupt violation of duty and law, must be answered f°r on indictment.
 

 But because this is not a case for a mandamus, the judgment of the Superior Court must be reversed, and the motion of the relator for a peremptory mandamus refused, with costs.
 

 PjeR CimiAM, Judgment reversed.