BYNUM, J. dissents.
The substantial facts as agreed, are:
The premises, the subject of the controversy, prior to the 17th February, 1864, was the separate property of Hetty, the then wife of A. H. Curtis, since dead, and who since his death has intermarried with the defendant, D.C. Carpenter. On the 17th of February, 1864, Curtis and wife sold the land for a full and fair price, to one Benjamin Jacobs, from whom, through a regular series of conveyances, the plaintiff herein claims. The only question arising, being as to the sufficiency in law of the private examination of the feme grantor.
No question as to consideration; and it is conceded that the deed to Jacobs was executed freely and without fear, force or undue influence, by Curtis and wife, now married to defendant. At the time, the parties resided in Newbern, and that town was within the lines and in the possession of the United States army; that no communication existed, or was permitted between that place and other portions of the State, not within those lines; and that there was no civil authority within those lines competent to take the probate of the deed and the private examination of the feme covert. One J. W. Denny, Captain in the United States army, was Provost Marshal in Newbern at the time, and acting as military Judge, with all the power (503) in the premises, which the military authorities of the United States could invest him with. He pretended to take the private examination of Mrs. Curtis, and endorsed the certificate of the same so taken on the deed to Jacobs.
If the Court should hold with the plaintiff, then judgment will be rendered in his favor with sixpence damages and costs; otherwise for the defendant.
His Honor, upon consideration, being of opinion that the plaintiff ought to recover, so adjudged; whereupon defendant appealed.
I. The deed of a feme covert, without private examination in strict conformity to the statute, is a mere nullity, and void. Robinson v.Barfield, 6 N.C. 390; Burgess v. Wilson, 13 N.C. 306; Fenner v. Jasper,18 N.C. 34; Atkins v. Daniel, 27 N.C. 322.
II. The deed of a married woman is utterly void at common law, and only when executed as directed by statute can it be valid. Sutton v. Sutton,18 N.C. 582.
III. Although willing to convey when she executed the deed, but *Page 408 
changing her mind before private examination, did no good. Etheridge v.Ferebee, 31 N.C. 312.
IV. War is a misfortune, and if defendant was not examined because of war, he cannot complain in Court.
There was no necessity of a sale. Suppose an infant's land had been sold by order of a Provost Marshal, could the sale be sustained because of war or necessity?
V. Tha [The] provost courts were only police courts, and had no civil jurisdiction. The President could not confer jurisdiction. Jecker v.Montgomery, 13 Howard, 514.
VI. Why not have appointed a private soldier to take the examination?
I. Under the circumstances of the case the privy examination is good although not taken in the manner required by law.
(504) It is good upon the ground of necessity. The city of Newbern and the surrounding territory were under military occupation. There were no officers competent by the State law to take the examination, and it was illegal for the married woman to go out of the military lines to seek such an officer.
At the same time it was the policy of the Government to restore civil government in the conquered territory. See the entire history of the time, also act of July 13, 1862; act of July 2, 1864; proclamations of the President, August 16, 1861, and October 20, 1862, and generally the appointment of military and provisional Governors, as Edward Stanly, in North Carolina. U.S. Statutes at large.
The State laws were practically suspended and it was deemed necessary that property should be sold for business purposes. It was more necessary than in ordinary times, for the support of those who had no other means and it might well have happened that a married woman might have starved with a thousand dollars worth of real estate, because there was no officer competent to take her private examination.
Under these circumstances, the Government did well to appoint officers who should assume this jurisdiction under due restrictions of legal form.
There is no particular sacredness in the privy examination of married women which should exempt it from ordinary rules. It did not exist prior to 18 Edw. 1. It was enacted here by act of 1715.
Its object is to protect, not to hamper, married women. Barfield Combs, 20 N.C. 514. *Page 409 
Its main beneficence lies in the protection of the private examination, and that was observed in this case.
It would be "sticking in the bark" to say that during the military occupation the mere person and office of the official taking it was material.
And it would be a hard measure for an arbitrary rule to deprive of his property a man who had in good faith paid to defendant's wife the money that supported her during the war. (505)
II. The law requiring a private examination before a judicial officer of North Carolina of a married woman was not in force in Newbern from the military occupation until April 2, 1866, the date of the termination of the war, as stated in the case of "The Protector," 12 Wallace 100.
The United States had over the occupied territory all the powers of a belligerent as well as of a sovereign. Prize Cases, 2 Black. 673; Tyler v.Defrees, 11 Wallace 331; Miller v. United States, 11 Wallace 268. The laws of war therefore must be our guide in considering the condition of the occupied territory in North Carolina during the military occupation.
As the Chief Justice remarks in Buie v. Parker, 63 N.C. 137, "The notion that, although North Carolina was in rebellion, yet inasmuch as she was a State in the Union, the general government had not a right to `hit her as hard' as if she had been a foreign nation at war, we consider fully disposed of."
During the military occupation, the people of Newbern were bound by such laws, and such only, as the Federal Government, speaking through Congress and the Executive, chose to recognize or impose. United States v. Rice, 4 Wheaton 254; Fleming v. Rice, 9 Howard 614; Thorington v. White, 8 Wallace 10; Wheaton's International Law, § 347, note. The doctrine is very clearly laid down in the last named authority: "Congress is considered as having a general authority to make laws for the government of such places, and in the absence of the acts of Congress, the President, as Commander-in-Chief, establishes such rules as he sees fit."
It is true that the laws other than political are often allowed to remain, and this would perhaps be more certainly true in our case because the conquered territory was a part of the United States and might be supposed to be restoring its own laws. But this stands only upon the reason given in Wheaton, "that some laws must exist to regulate private rights and relations." The jurisdiction of the State Courts could not come within this rule. As a matter of fact (506) they did not exist. *Page 410 
All that remained of the act of 1715 was the manner and form of the examination; the officer to take it was not in existence until appointed by the military authorities, as was done in our case.
The subordination of the conquered territories to military law has been abundantly recognized in the decisions of this State. In its effect upon emancipation. Harrell v. Watson, 63 N.C. 457; Buie v. Parker, 63 N.C. 136. In the numerous cases of obedience to military orders. McCubbins v.Barringer, 61 N.C. 556; Broughton v. Haywood, Ib. 384; and in recognizing provisional governments of the State and municipal corporations. Boyle v.Newbern, 64 N.C. 664; and was affirmed in the case of White v. Hart, 13 Wallace 648.
III. The provost Judge had all the powers in the premises of a Judge of the Superior Court of North Carolina.
In this case it is expressly admitted that the military authorities did appoint a Judge to take the privy examination of married women, who had all the powers that the military of the United States could give him.
That the military authority of the United States is competent to create such a Court must, in view of the recent decisions of the United States Supreme Court, as well as recent State decisions, be considered as settled.Edwards v. Tanneret, 12 Wallace 446; Homdlin v. Wickliff, 12 Ib. 174; TheGrape Shot, 9 Wallace 129. The strong authority of these cases can hardly be added to by the State cases, some of which, however, I will cite. Scottv. Billgony, 40 Miss. 119; Rutlige v. Hogg, 8 Cold. (Tenn.) 554; Shuter v.Cobb, 39 Ga. 285; Griffin v. Cunningham, 20 Gratton 31.
Happily for us, the questions to be dealt with in this case, are not of "familiar learning" in our Courts. Probably, the industry of the learned counsel for the plaintiff, has referred us to (507) all the authorities which are accessible. But they bear only remotely on the special question in controversy here, and we must decide the case by the aid of a few generally admitted principles, and what seems to be fair and legitimate conclusion from them.
The following doctrines are taken to be generally admitted. When the armies of the United States during the late war, took hostile possession of part of the territory of one of the seceding States, it ceased, in legal contemplation, to be a part of the State, during the continuance of the occupation. Nevertheless, the municipal laws for the regulation of the personal relations of the inhabitants, and of their contracts and dealings with each other, continued in force, except when they were expressly suspended by the military authority, or were opposed to the military or political policy of the United States. Dana's note to sec. *Page 411 
346 of Wheaton's International Law, (4); Cooke v. Cooke, 61 N.C. 383;Boyle v. Newbern, 64 N.C. 664.
The conquering power might however make any new laws that it pleased. The officers of the State were suspended from their functions, and the military authority might appoint others, and prescribe their powers and duties. It might establish Courts with such jurisdiction, civil and criminal, as it thought proper to confer. The Grape Shot, 9 Wall, 129. In short, during the continuance of the occupation, the military power was supreme, not only in fact, but lawfully under the law of nations, subject only to the laws of its own government, the rules of natural justice and equity and the law of nations.
The question then occurs: peace being restored, and the State remitted to her former sovereign rights over the territory, what effect will be allowed to the judgments of such Courts, as between the inhabitants? (The ordinance of October, 1865, and the act of 1866, chap, 36, are in their terms confined to the acts of officers under the Provisional Government, and do not seem to reach this case.) While the territory thus held ceased temporarily to be a part of the State, it did not become by the mere fact of the belligerent occupation, a (508) territory, or part, of the United States. The laws of the United States did not act there proprio vigore; those applicable to internal commerce did not apply; and the inhabitants were not entitled to the rights and franchises of citizens of the United States. Dana's note to Wheaton, ante.
The territory was legally, foreign territory held by the United States, as much so, as if it had been a part of England or of Mexico, and the Courts established were foreign Courts. It follows that the effect of their judgments is that which is allowed to foreign judgments; that is, primafacie, if not, in the absence of fraud and the like, conclusive evidence of the matters adjudicated. Bigelow on Estoppel, 185 et seq.; Duchess ofKingston's case, Smith L. Cases, notes.
To take the acknowledgement and privy examination of a feme covert to a deed conveying her land, is a judicial act, and when duly taken, the deed is an assurance of record, like a fine in England. Woodbourne v. Gorrell,66 N.C. 82. The record of acknowledgement, c., does not, of itself, pass the title to the land, or profess to do so; but it adjudicates and records the fact of the wife's free consent to the deed, which thereby becomes complete and passes the title. Hence the law of North Carolina authorizes foreign courts to take such acknowledgement. Rev. Code, chap. 37, secs. 7 and 12, provides, that when the husband and wife reside in a foreign country, her acknowledgement, c, may be taken *Page 412 
by an ambassador, c., of the United States, or by the mayor or other chief officer of any city or town. In this case it is agreed by the parties, that the Provost Marshal had all the power in the premises which the military authority could confer. Pro hac vice, he was the chief officer of the town of Newbern.
Very probably an application of the act cited, to a case like this, was never anticipated by its authors, but we think it is within the scope and legal intent. No question arises as to the record being only (509) prima facie evidence, for the case states that in fact the feme
did freely consent.
PER CURIAM. Judgment affirmed.
Jones v. Cohen, 82 N.C. 79;Varner v. Arnold, 83 N.C. 210; S. v.Knight, 169 N.C. 342; S. v. Scott, 182 N.C. 874.