VARNER & DORSETT v. PENNEL ARNOLD and others.

### *Military Orders—Public Law.*

The orders of military commanders exercising authority under the federal government in North Carolina immediately after the war between the states, relating to the administration of civil affairs, had no further efficacy than such as they drew from the superior force which upheld them.

(*Barnes* v. *Barnes*, 8 Jones, 366; *Davidson* v. *Sharpe*, 6 Ired., 14; *Broughton* v. *Haywood*, Phil., 380; *McCubbins* v. *Barringer*, *Ib.*, 554; *Isler* v. *Kennedy*, 64 N. C., 530; *State* v. *Kent*, 65 N. C., 311; *Paul* v. *Carpenter*, 70 N. C., 502, cited, commented on and approved.)

CIVIL ACTION to recover Land, tried at July Special Term, 1879, of RANDOLPH Superior Court, before *Avery, J.*

The plaintiffs appealed from the judgment of the court below.

*Messrs. Scott & Caldwell* and *J. N. Staples,* for plaintiffs.
No counsel for defendant.

SMITH, C. J.　The land in dispute belonged to William Varner, who, with his wife, on November 22d, 1870, conveyed to the plaintiff Andrew J. Varner, and the latter soon afterwards to his co-plaintiff, Sarah Dorsett, for whose benefit the recovery of possession is sought. The defendant Pennel Arnold (the others named being his co-tenants) deduces title under a judgment recovered before a justice of the peace by one Hezekiah Fuller, against the said William Varner, a writ of *fieri facias* levied on the land, the return of the proceedings to the county court at February term, 1868, the award of *venditioni exponas*, the sheriff's sale and deed to the defendant, Pennel, executed May 8th thereafter.

The determination of the question of title, under the con-

flicting claims· set up to the land, depends upon the force and effect of certain military orders emanating from the officers assigned under the act of congress to the command of the military district of which this state formed a part. These orders were issued—No. 10 on April 11th, 1867, by Gen. Sickles; No. 64 on December 31st, 1867, modifying the first, by Gen. Canby, his successor; and the last, No. 57, on April 2d, 1868, by the same officer. The provisions of the superseding order of Gen. Canby, (No. 64,) so far as they bear upon the present enquiry, are as follows:

"Judgments or decrees for the payment of money on causes of action arising in North Carolina between the 20th day of May, 1861, and the 29th day of April, 1865 　*　　* shall not be enforced by execution against the person or property of the defendant.

After the passage of the ordinance of the state convention and its ratification on the 14th day of March, 1868, "respecting the jurisdiction of the courts of this state," order No. 57 was issued declaring that the ordinance "is hereby approved and will have the force and effect of law in said state until the question of the ratification or rejection of the constitution, framed by said convention of the people, shall have been determined by an election held, &c."

It is needless to discuss the compatibility of the ordinance as an act of the legislative authority of the state, with the constitution of the United States, in undertaking to discriminate between different classes of debts of equal binding obligation, and to restrain creditors, whose claims arose before a fixed arbitrary date, from pursuing the remedies for their enforcement open to others; or subjecting them to delays for the relief of debtors, and we only refer to the adjudication of this court in *Barnes* v. *Barnes*, 8 Jones, 366, and of the supreme court of the United States in *Edwards* v. *Kearsey*, 96 U. S., 595, as settling the law. The sole question is as to the legal effect of these military edicts, and the

force imparted by the last to the ordinance of the convention. The state had just emerged from a severe and unsuccessful struggle for a separation from the United States, and congress deemed it necessary for a time to place it under military control. It was accordingly enacted that the President assign a military commander to each district with a sufficient force to enable him " to perform his duties and enforce his authority within the district," and he was required " to protect all persons in their rights of person and property, to suppress insurrection, disorder and violence, and to punish or cause to be punished all disturbances of the public peace and criminals," and to this end to " allow local civil tribunals to take jurisdiction of and to try offenders, or where in his judgment it may be necessary for the trial of offenders," he may " organize military commissions or tribunals for that purpose."

It is manifest that the power conferred aimed mainly at the preservation of the public peace, the repression of hostility to the re-established federal authority, and the protection of persons and property in their ordinary and legitimate pursuits. It was not intended that the quiet and regular execution of the laws in force, not hostile to the policy of the general government, should be obstructed by military interference, and still less that laws should be promulgated and enforced in the administration of internal civil government. The power to do this was possessed and exercised, and submission demanded and yielded, and yet the constitution of the United States, which retained an unbroken union during the war, was asserting its sovereign authority over the state with all its guaranties in unimpaired strength.

When the orders were issued, civil government was in full operation in this state, although declared provisional and subject to the paramount authority of congress, the laws were enforced through the constituted judicial tribunals as

before the war, and the legislature had exercised its law-making functions. The supervising and controlling authority conferred by the reconstruction acts (as this legislation is called) acquiesced in by the people from necessity, was not intended to be asserted for the objects contemplated in the orders, and those orders, in our opinion, had and have no legal efficacy, except as obedience was compelled by the use of force. RUFFIN, C. J., uses this language: "The decree operates *in personam* only and proposed to do no more. It is to be enforced only by process of contempt. It does not render this bond less the obligation of the plaintiff in law than it was before the decree. While it is in existence unpaid and uncancelled, a court of law is obliged to hold it to be the plaintiff's deed, leaving the court of equity to act on its suitors as it is quite able, effectually to do."

An analogy may also be found in that principle of the law of war which gives effect to such orders of the commander of an invading army, so far only as they can be and are enforced by the means at his disposal and no further, and all property rights not destroyed revive when it is withdrawn. Thus the proclamation of the President, giving freedom after January 1st, 1863, to all the slaves within the revolting territory, operated only as the national army advanced, and emancipation was afterwards accomplished by the action of the states themselves. Dana's Wheaton, § 347, note 8. So far only and as acts of force have the military orders referred to been recognized in the decisions of this court heretofore.

In *Broughton* v. *Haywood*, Phil., 380, READE, J., compares order No. 10 to an injunction restraining the court from issuing execution.

In *McCubbins* v. *Barringer*, Ibid., 554, the court undertakes to construe the order, but refrains from the expression of an opinion as to its intrinsic legal efficacy.

In *Isler* v. *Kennedy*, 64 N. C., 530, the attempt was made

to hold the sheriff responsible for not proceeding under an execution on which he returned that he had made no sale "in obedience to order No. 10 from Gen. Daniel E. Sickles, and it was held that "as the state was then under military control, the sheriff was bound to obey general orders."

So again in State v. Kent, 65 N. C., 311, READE, J., avoiding the recognition of any right of interference on the part of the military authorities with the execution of our own laws in the punishment of crime, remarks that "whatever force there was in the military order, it was not more than to suspend the law, and as soon as the order ceased, the law was restored to be administered as before."

In Paul v. Carpenter, 70 N. C., 502, where the privy examination of the wife touching her voluntary execution of a deed was taken before the provost marshal at Newbern, then in the occupation of the United States troops, where civil government had been suppressed, the acknowledgment before the officer de facto clothed with authority to take it by the officer in command was sustained and the probate declared sufficient.

The federal constitution, the only bond of union among the states, though its voice was hushed and its power suspended amid the din of arms, at the close of the conflict reasserted its supremacy over all the states as amply as before the attempted rupture. Whatever necessity may have been supposed to exist for placing these states in their transition from war to peace under the supervisory control of military commanders, it would be difficult to find any warrant in the constitution for conferring the powers, had congress so intended, they assumed to exercise over the legitimate action of the civil authorities. Self-government is the vital principle of our institutions, national and state, and the theory of both governments, in the language of Mr. Justice MILLER in Loan Association v. Topeka, 20 Wall, 655,

" is opposed to the deposit of unlimited power any where."
We cannot, therefore, allow to the orders interfering with
the due and peaceful administration of the laws by the
courts of the state, any other operation than such as results
from the exercise of force, and they are insufficient to invali-
date the legitimate action of the courts or to impair rights
thence derived.

The ruling of the court below must be sustained and the
judgment affirmed.

No error. Affirmed.