ALFRED SHORTER, plaintiff in error, *vs.* J. L. COBB, *et al.,* defendants in error.

The Courts of Georgia, organized under the Constitution of 1868, have no jurisdiction or authority to try, or give judgment on, or enforce, any debt, the consideration of which was a slave or slaves, or the hire thereof.   WARNER, J., dissenting.

Pleading.   Jurisdiction.   Slave note.   Before Judge HARRELL.   Randolph Superior Court.   November Term, 1868.

Shorter, as bearer, sued J. L. Cobb, *et al.,* upon their promissory note, dated the 16th of July, 1861, and due twelve months after date.   When the cause was called for trial, the defendants' counsel moved to dismiss it, upon the ground that said note was given for slaves.   Without submitting the cause to a jury, the Judge examined Cobb, who testified

that said note was given for slaves.    Thereupon, the cause was dismissed.    This is assigned as error.

A. HOOD, for plaintiff in error, as to the unconstitutionality of the prohibition of jurisdiction by the Constitution of Georgia, cited, 4 Ga. R., 220; 28th, 345; 1 How. R., 317; 6th, 327, 333; 2nd, 608; 8 Wheat. R., 76; 4 S. & M., 507; 15 Mass. R., 447; 8th, 430; 3 Peter's R., 290; 2 Gall. R., 141; Story on C. of L., section 1379.

H. FIELDER, for defendant.

BROWN, C. J.

The first error assigned relates to the ruling of the Court below, in dismissing the action for want of jurisdiction, without ordering an issue made up and tried by a jury, to determine whether the note in question was in fact given for slaves.    The record does not show that there was any denial of this fact by the plaintiff, or that he demanded a trial by a jury.    It is evidently the duty of the Court, before it orders a case dismissed for want of jurisdiction, to ascertain, in some legal way, that it has no jurisdiction of the subject-matter of the suit.    But it may ascertain the fact in a summary manner, by examining witnesses who are cognizant of it; and, when satisfied, may act upon such information and evidence, unless one of the parties tenders an issue of fact (which should, I think, be verified by affidavit, as in case of pleas filed under our new Constitution), and demands a trial by jury, when it would be the duty of the Court to order the question of fact in dispute to be determined by a jury.

1. But the great question in this case, is not whether the note in suit was given for slaves, which is not seriously controverted, but whether the Courts of this State have jurisdiction to enforce the collection of a note given for a slave or slaves.    In our judgment, they have no such jurisdiction.

Much has been said in the argument, about that provision of the Federal Constitution, which forbids any State to pass any law impairing the obligation of contracts, which, I trust,

Shorter *vs.* Cobb *et al.*

I shall be able to show has no relevancy whatever to the question now under consideration. It is not necessary in this case for me to discuss the question, whether an Act of the Legislature of a State, whose relations to the Union have never been disturbed and whose government has never been destroyed by secession or rebellion, which denies all remedy to parties to enforce a particular class of obligations, is Constitutional or not. In the former case of *Cutts, et al., vs. Hardee,* decided at last December Term, I had occasion to cite the opinion of that great American jurist, Chief Justice Marshall, that this section of the Federal Constitution now under consideration is prohibitory, not mandatory, and that no State can be compelled to organize Courts, and afford remedies to enforce contracts. But the discussion of that question, as applied to a State in full fellowship with the other States of the Union, is in no way necessary to the decision of the case made by this record.

Georgia was one of the States lately comprising the Confederate Government, which set aside the Constitution of the United States, and declared it no longer obligatory upon them, and adopted another Constitution and Government antagonistic to the Government of the United States, to which they required all their officers to swear allegiance. They displaced all Federal officers within their limits, who would have been punished for treason to the Confederate States, if they had attempted to hold their positions, and to uphold the authority of the Government of the United States. They organized a Government, complete in all its parts, which held supreme power over a vast territory, and maintained in the field for four years, against the Government and armies of the United States, one of the most gigantic and heroic struggles recorded in the history of the world. They rejected the flag of the United States, and adopted one of their own in its stead. They sundered the Union, which was in fact destroyed so far as it was possible to destroy it, by force, and so remained, as long as they were able, by their armies in the field, to maintain and defend the Constitution and Government set up by them, under the flag

adopted as the emblem of their nationality. The Union was not only destroyed during the period of the war, but its destruction would have been permanent, had not the armies of the United States been able to break the power of the Government of the Confederate States, and restore it by force. Had the seceeding States been successful, *might* would have compelled the recognition of the *right* of their cause; and those who were in contemplation of law rebels and traitors, by reason of their failure, would, on account of their success, have been distinguished as patriots and heroes.

When the armies of the Confederate States surrendered and its power was crushed, the people of the seceding States were not thereby restored to their former position in the Union, but they became a conquered people, subject to the fate of the conquered; and the Government of the United States, as it existed during the war, became the conqueror, with all the rights and powers of the conqueror over the conquered. And the seceding States, as the conquered, had no rights without the consent of the conqueror, to return to and restore the Union which they had repudiated, and claim the protection of the flag and the guarantees of the Constitution which they had solemnly renounced and thrown off.

The position that has in effect been assumed and ingeniously defended, that a State may secede, or engage in rebellion against the Government of the United States, renounce its authority, refuse to perform her obligations as a State in the Union, imprison or drive the officers of the United States from their positions, and refuse to permit them to exercise their official functions, wage war, with zeal and energy, for years against the other States of the Union, and if successful, establish and maintain an independent rival power, but if unsuccessful, after she has exhausted all her strength and resources to destroy the Government, may then, as matter of right, return and take her position in the Union, and demand all her guarantees and privileges as a member of the family of States from which she seceded, or against which she rebelled, is not only a practical absurdity, but is contrary to the usages which govern the intercourse between civilized

Shorter *vs.* Cobb *et al.*

nations, if not contrary to equity and common sense. I venture the assertion that not a secessionist, in or out of office, in the Confederate States, held any such doctrine during the war, or expected any such result in case of our failure. The people of the seceding States took the chances when they determined to withdraw from the Union, and having failed, they could not reasonably expect to escape the penalties of defeat. And candor compels me to add, that the terms dictated were not more rigorous than we, in the then embittered state of popular sentiment, would have dictated to them had our positions been changed and we had been the conquerors and they the conquered.

If the Union still existed during the war, it was the right of either party, at the termination of hostilities, to resume the free exercise of all the rights and privileges, and to demand that the other party faithfully comply with all the obligations existing under or resulting from it, as originally formed and entered into by all the States. This would seem to be a proper test of its continued existence. Was it the right of both parties, at the end of the war, to demand its restoration upon its original basis ? If it existed at the end of the war it existed during the whole period, and it was the right of Georgia, or any other State of the Confederacy, to elect Senators and Representatives who were not individually objectionable, who would have had a perfect right to their seats in the Federal Congress. Probably the most zealous advocate of the doctrine that the Union was never dissolved would hesitate to admit this right in the seceding States during the war. And yet there is no escape from it, if the doctrine that the Union was never dissolved be true.

To my mind it is self-evident that if the conquering States, at the end of the war, had refused to restore the Union, or to have any further association or connection with the seceding States, the latter would have had no right to demand its restoration, or to claim the further protection of the Constitution upon which the rejected Union was based. It follows, therefore, whatever may have been the legal right of the Government of the United States to exercise jurisdiction

over the territory occupied by the Confederate States, that the union between the States, *as organized governments,* which existed at the date of secession, ceased to exist when the States withdrew from it, took up arms against its authority, and established a new confederation between themselves, which it became necessary that the Government of the United States should recognize as independent or destroy by force. Having refused to acknowledge its independence, they called forth a million of armed men for its overthrow,. which could only be accomplished by the subjugation of its people. Notwithstanding the determined purpose of the Southern people, and the intrepid valor of the Southern armies, this great task was accomplished by overwhelming superiority of numbers and vast advantages in resources.

When the Government succeeded in our subjugation, and became a conquering power, it acquired the legal right to dictate the terms upon which the conquered States should be restored to position in the Union. And the conquered States had no appeal from the decision, and no alternative but submission to the térms dictated. If the conquering power in such case dictates terms that are illiberal or unreasonable, it is amenable only at the bar of civilization, to the high court of enlightened public opinion, which may censure, but will seldom undertake to reverse a harsh judgment in such cases, however much it may deserve condemnation.

The view I take of this question is sustained by the action of the Federal Government in the premises. Although the Executive and Legislative departments of that Government have been inharmonious during the greater portion of the time since the surrender, there has been no disagreement between them as to the position occupied by the conquered States at the end of the struggle. While they have agreed that the Government of the United States still retained its rightful jurisdiction over the territory and people of the conquered States, they both hold that civil government was entirely destroyed, and that all legal State governments ceased to exist in these States during the war, and that this state of things must continue till new State governments, republican

in form, are established, under the control and with the approval of the Government of the United States, whose duty it is, under the Constitution, to guarantee such government to every State in the Union.   The only controversy has been, how such new State governments are to be established, and by what department of the Federal Government it is to be done.

Immediately after the surrender, the President of the United States ordered the arrest and imprisonment of the Governors of most of the Southern States, and forbade their Legislatures to assemble on pain of like treatment; and in a solemn proclamation, dated 17th June, 1865, he declared that the rebellion "has, in its revolutionary progress, deprived the people of the State of Georgia of all civil government." Like proclamations were issued as to other States.   He also appointed a Provisional Governor for each State, and ordered the election and assemblage of a Convention to form a new State government.   He prescribed the qualification of voters and office holders, and dictated the leading measures to be adopted.

The provisional government set up by the President was a military government, absolute in its authority, recognizing no civil government in the State except such as was appointed or sanctioned by it.   The President recognized the authority of the military commanders in these States to arrest and try citizens by military courts who committed crimes punishable under the penal code of the State in the Courts of the State.

On the 21st of *July, 1865,* Hon. W. L. Sharkey, the Provisional Governor of Mississippi, informed the President of the commission of a murder in that State by a person who had no connection with the army, and of his arrest and detention by General Slocum, then in command of the military, who refused to obey a writ of *habeas corpus* issued by a competent Judge, and held the prisoner for trial by military authority, against which the Provisional Governor remonstrated.   In reply, the Secretary of State acknowledged the receipt of the telegram, and proceeded as follows : "The President sees no reason to interfere with General Slocum's

proceeding. The government of the State will be provisional only, until the civil authorities shall be restored, with the approval of Congress. Meanwhile military authority can not be withdrawn."

These quotations are sufficient to show the position of the President upon this question. He not only held all State Government destroyed in these States, but he held that no *civil* government existed, except such as he thought proper to create; and he governed the people by military authority, till such time as in his good pleasure, he ordered the Government turned over to the State officers elected under the Constitutions formed by the Conventions assembled by his direction.

Thus the matter stood, when Congress assembled at the time fixed by law. The President submitted his action to Congress, and asked their approval. But that body, after mature consideration, refused to recognize the Governments set up by the President, and claimed that the power of reconstructing the rebel States, by guaranteeing State Governments to the people, republican in form, belonged to Congress, in whom the war power is vested, and not to the President.

On the 2d of March, 1867, Congress passed an Act, by which it is declared, that "no legal State Governments" then existed in the rebel States, of which Georgia was mentioned in the Act as one; and that it was necessary that peace and good order should be enforced in said States (by the military power of the United States), until Republican State Governments "*can be legally established.*" Said Act also declared any civil government that may exist in said States provisional only, "and in all respects subject to the *paramount authority* of the United States, at any time to abolish, modify, control, or suspend the same."

Before any State Government to be formed under said Act of Congress is to be operative and valid, the requirement of the Act is, that the new Constitution "shall have been submitted to Congress for examination and approval, and Congress shall have approved the same." If Congress

failed to approve it, on examination, it was inoperative and of no effect, till so approved.

By a careful examination of this Act, and the subsequent Acts passed by Congress on this subject, it will be seen, that the position is boldly and fearlessly assumed, that no civil governments existed in these States at the end of the war, or at the date of the Acts.  Congress acted upon the theory that the State Governments were destroyed by the act of the seceding States and by the war, and that no civil governments existed here at the surrender, and that the Governments set up by the President were illegal, and therefore the people were without any State Governments, and that it was the right of Congress to *abolish*, modify, control, or suspend the pretended Governments then in existence at pleasure. And this has been done without hesitation, whenever, in the opinion of Congress or the military authorities, it was necessary to do so to carry out the Congressional plan of reconstruction.

As already stated, the Governor of this State was arrested and imprisoned, by order of the President, at the surrender, and a new Government was set up by him, and a Governor elected and installed into office.  And, in turn, the Governor so elected under the Constitution formed by the President's dictation, was removed from office by order of the Military Commander of this District, and his place filled by an officer of the army, which act met the approval of Congress, and stands unreversed.

Now, I ask, in all candor, upon what principle this action of the Government can be sustained, if the State of Georgia was in the Constitutional sense a State in the Union ?   I do not mean to deny, that the territory of the State, by the results of the war, remained within the jurisdiction of the Government of the United States.   In other words, that the *territory* was in the Union, just as the territory of California was in the Union, after the treaty of peace with Mexico, by which the Government acquired it as part of her conquest. But while it was in the Union, in a territorial sense, it had no *organized State Government*, and was not, in the Constitu-

tional sense, a State in the Union. It had no Senators and Representatives in Congress, and no right to send any, till provision for their reception was made by Congress, and they were elected and sent with the approval of Congress. So with the seceding States. By the war against the Government they lost their position in the Union as *organized State Governments*, and can never regain it, without the consent of the other States, made known by their Representatives in Congress, or in some other legal way. And as the other States, which adhered to the Government, subjugated and held these States as conquered territory, they had the legal right, according to the laws of war and of conquest, to prescribe the terms upon which they should be re-admitted as States into the Union and to hold and govern them as conquered States, till they accepted and complied with the terms so prescribed. So soon as the conquered States complied with the terms, the faith of the conquering Government was solemnly pledged to re-admit them into the Union again, with all the rights enjoyed by the other States. Upon compliance on their part, it became the right of the conquered States to demand that the pledge be carried out in strict good faith, and that they be restored to the Union, to enjoy in future perfect equality with the other States.

As the organized Government of Georgia, under which she became a party to the compact by which the Union was formed, was destroyed by secession and war, and the new Government created by her in its stead was in its turn destroyed by the military power of the United States, leaving her people without any organized civil government, and as the jurisdiction and power of the United States was re-established over her territory and people, it became the duty of Congress, in whom not only the war power but the power to admit new States is vested by the Constitution, to interpose, and re-establish and guarantee to the State a republican form of government.

This is not only an express obligation resting upon Congress, as applicable to the organized States in the Union, but it is an obligation which, by implication, has always been

recognized as applicable to all the territory within the jurisdictional limits of the Government.

It is not the policy of the people of the United States to hold any territory of proper limits, which has sufficient population to form a State, whose people are desirous of State government, long in a territorial condition, subject to the control of Congress. But it is the well-settled practice of the Government to allow the people of such territory under the supervision of Congess, to form a Constitution and organize a State Government, republican in form, and to admit the State so organized into the Union, on terms of perfect equality with the other States. The policy is the same, no matter how the territory is acquired, whether by cession by a State, as in case of the North-Western territory by Virginia, or the territory of Alabama and Mississippi by Georgia, or by purchase, as in case of Louisiana and Florida, or by conquest, as the result of war with a foreign power, as in case of California and other territories, or by subjugation of seceded States, as in case of South Carolina, Alabama, and other States.

In carrying this guarantee into effect, Congress may require that the new State Constitution shall contain certain fundamental ideas on great questions of public policy, as has been done in case of new States organized out of part of the territory of the United States, where it was required that slavery or involuntary servitude, except as a punishment for crime, should by the Constitution of the State, be forever prohibited, or the State should not be admitted under it. If Congress may require the adoption of the above provision as part of the State Constitution, why may it not require or permit any other like provision, as for instance, that the Constitution shall contain a clause denying to the Courts of the State organized under it, jurisdiction to enforce any contract, the consideration of which is a slave? If Congress has power to require that the one be adopted as part of the State Constitution, why has it not power to require or permit the other?

Apply the rule, so well established in practice, to the con-

quered States, and it will be found equally applicable. Soon after the surrender, the President of the United States required the Conventions, assembled under his order in the conquered States, to insert in their State Constitutions a clause abolishing slavery, without any provision for compensation to the owners of slaves, and that the legislatures, to be assembled under the new Constitutions, give their assent to an amendment of the Constitution of the United States to the same effect. At that time, the President was understood to be the representative of the conquering Government, and his dictation was considered its requirement. What was the result? One of the most intelligent Conventions that ever assembled in Georgia, composed of some of her ablest Constitutional lawyers and most profound statesmen, gave their assent to this provision, and inserted it in the Constitution of the State, without pretending to question the right of the conqueror to make the requirement. The Constitution recites, that the Government of the United States, as a war measure, has proclaimed all slaves held or owned in this State emancipated from slavery, and that the proclamation has been carried into full practical effect, and then declares, that "there shall henceforth be within the State of Georgia neither slavery nor involuntary servitude, save as punishment for crime, after legal conviction thereof." It is true, a proviso is added, saving the right of any citizen of the State to make his claim for compensation upon the "justice and magnanimity" of the Government of the United States. But the Convention itself abolished slavery absolutely, without making any provision for compensation; and probably no member of it expected that the Government of the United States would make any.

Here was an absolute acquiescence by the intelligence of Georgia, assembled in Convention, in the doctrine that the conqueror had the right to dictate the terms of settlement to the conquered, who were bound to submit to and carry them into effect. The result of this action was the destruction of nearly half the taxable property of the State. This has since been approved by the Congress, which is the legal represen-

Shorter *vs.* Cobb *et al.*

tative of the conquering powers, and is now irrevocably fixed upon the people of the State.

Now I ask whether this action of the people of Georgia in abolishing slavery under the dictation of the President of the United States, without compensation to the owners, when the property of the slave-holder in his slave was guaranteed by the Constitution and laws of the United States, is to be upheld by the Courts of the States and of the Union; and if so, upon what principle?   That it is to be sustained no one questions. But how?   It can only be done upon the principle that the State was conquered, and that she acted in obedience to the requirement of the conquerer, that the reconstruction of the Government is a great political problem to be solved by the law-making power of the United States, whose province it is to decide what the new State Constitution shall contain, prior to the admission of the State into the Union, and to determine when the new Government is republican in form. And when such decision is made, and the new Constitution and Government of the State has been examined and approved by Congress, and the State admitted under it, the Courts will conform to the decision of the department of the Government having jurisdiction over the question, and will carry it out without going behind it to look into the grounds upon which it was made.

If the people of Georgia in Convention, acting under the control of the Congress of the United States, may abolish slavery, without compensation, and thereby destroy the property of the slaveholder in his slave, why may they not, under the same power and control, deny to the Courts organized by them, power to enforce an obligation given for a slave?   Was not the right of property in the slave as fully protected by the Constitution and laws of the United States, as the right of the vendor from whom he purchased, in the note given for the same slave?   If the new State Constitution formed under the supervision of Congress may destroy the one, why may it not deny jurisdiction to enforce the other?

Upon what principle of justice or equity can the Government enforce the payment of all notes given for slaves, in

the hands of vendors, when the slaves for whom they were given, who were generally warranted by them to be slaves for life, were emancipated by the Government in the hands of the vendees, without compensation, and in many cases without any pretence of fault on their part? What solid distinction in principle can be drawn between the right of property in a slave, and the right of property in a note given for the same slave? If the Government of the United States may compel the destruction of the one, why may it not compel or permit the organization of Courts, in a State applying for admission into the Union, without jurisdiction to enforce the other?

It is a well established doctrine that the Constitution or laws of a State passed prior to its admission into the Union, which were examined and approved by Congress, when the State was admitted, are not subject to be reviewed or set aside in the Courts of the Union, on the ground that they impair the obligation of contracts.

This question arose at an early period, under a statute passed by the Legislature of Virginia, the year before she became a member of the Union, and it was held by the Supreme Court of the United States, 5 Wheat., 420, that, the provision as to the obligation of contracts, did not extend to a State law enacted before the Constitution of the United States went into operation, and Virginia became a member of the Union under it.

In the case of Scott *et al.*, vs. Jones, 5th How. 343, which depended upon the validity of an Act of incorporation granted by the Legislature of Michigan, at a time when Congress had not recognized her as a State in the Union, the same Court held, that in order to give it jurisdiction, the statute, the validity of which is drawn in question, must be passed by a State, a member of the Union, and a public body owing obedience and conformity to its Constitution and laws; that if public bodies not duly organized or admitted into the Union, undertake as States to pass laws which might encroach on the Union, or its granted powers, such conduct would have to be reached, either by the power of the Union

Shorter *vs.* Cobb *et al.*

to put down insurrections, or by the ordinary penal laws of the States or territories within which these bodies are situated and acting. In other words, the Supreme Court of the United States will not undertake to review the action of a State Legislature or Court, or to set aside Acts of the State Legislature, or decisions of the State Courts, enacted or pronounced when the State is not, with an organized government, a member of the Union. In this case Mr. Justice Woodberry, delivering the opinion of the Court, says, that in order to give that Court jurisdiction under the 25th section of the judiciary Act: "There must be an act of solemnity and importance, such as a statute, and the statute must be by a State, a member of the Union, and a public body owing obedience and conformity to its Constitution and laws.

This seems to have been settled by this Court, as the meaning of the word "State," when empowering one to bring an action. It must be a member of the Union, Cherokee Nation vs. Georgia, 5 Pet. 18. And it is not enough for it to be an organized political body within the limits of the Union." "In conformity with this, when it is required that a party should be a citizen of a different "State" in order to give a Circuit Court jurisdiction, it has been held it is not sufficient to be a citizen of the District of Columbia, (Peter's C. C. Reps. 64, 2 Cranch, 445,) or a citizen of a territory, 1 Wheat, 90, but the party must belong to a State in the Union, one of the members of the Confederacy."

In the same case, Mr. Justice McLean, who delivered a dissenting opinion, says : "no act of the people of a territory without the sanction of Congress can change the territorial into a State Government. The Constitution requires the assent of Congress for the admission of a State into the Union, and the United States guaranty to every State in the Union a republican form of government. Hence the necessity, in admitting a State, for Congress to examine its Constitution."

In the case, League vs. De Young, *et al.*, 11 How., 185, the Supreme Court held, that an Act passed by the Legislature of Texas, *prior* to her admission into the Union, could

not be set aside, on the ground that it impaired the obligation of contracts. In that case, Mr. Justice Grier, delivering the unanimous opinion of the Court, says: "If the Congress of Texas had abolished all these certificates, whether fraudulent or genuine, or if the people of Texas had done the same thing, by their Constitution adopted before their admission as a State in the Union, their right to do so could not be questioned by this Court, under any power conferred upon them by the twenty-fifth section of the Judiciary Act." "There is no allegation that the Legislature of the State of Texas has passed any law impairing the obligation of contracts, or affecting vested titles guaranteed by the Treaty of Union, *since* that State has been admitted as one of the States of this Union." This ruling was affirmed afterwards in the case of Herman vs. Phalen, 14 How., 79.

If the right of the people of Texas to incorporate a provision impairing the obligation of contracts into their Constitution, formed preparatory to admission into the Union, cannot be questioned by the Supreme Court of the United States, how can the right of the people of Georgia, in forming their Constitution under the dictation and supervision of Congress, to insert into it any provision necessary to their well-being and prosperity, be questioned by that high tribunal? *provided* no act is done which Congress is forbidden by the Constitution to do.

As already stated, the Constitution makes it the duty of Congress to guarantee to each State in the Union a republican form of government. In the case of Luther vs. Borden, 7 How., 1, the question arose, who was to judge what Government in a State is the established one, and whether it is republican in form? Chief Justice Taney, who was one of the ablest and truest exponents of the doctrine of the States' right school, in delivering the opinion of the Court, says: "Under this article of the Constitution, it rests with Congress to decide, what Government is the established one in a State. For, as the United States guarantees to each State a republican government, Congress must necessarily decide what Government is established in the State, before it can

determine whether it is republican or not. And when the Senators and Representatives of a State are admitted into the Councils of the Union, the authority of the Government under which they are appointed, as well as its republican character, is recognized by the proper Constitutional authority. And its decision is binding on every other department of the Government, and could not be *questioned* in a judicial tribunal." Again, " No one, we believe, has ever doubted the proposition, that according to the institutions of this country, the sovereignty in every State resides in the people of the State, and that they may alter and change their form of government at pleasure. But whether they have changed it or not, by abolishing an old government and establishing a new one in its place, is a question to be settled by the *political power*. And when that power has decided, the *Courts* are bound to take notice of its decisions, *and to follow them.*"

As the result of the foregoing authorities, and others which might be cited, I think it safe to lay down the proposition, that Congress, as its powers are now construed by the highest judicial authority, and settled by the verdict of the American people during the period of the war and since its termination, has power when a State whose territory is within the jurisdictional limits of the Government applies for admission into the Union as a State, to require as a condition precedent to admission, the adoption of any measure, as part of its Constitution, which Congress in its legislative capacity has power to enact and enforce.

It has been adjudged, that the provision of the Constitution of the United States now under consideration, which prohibits a State to pass any law impairing the obligation of contracts, does not apply to Congress, though such power is denied to the States individually. See Evans vs. Eaton, Peters' C. C. R., 337 ; Sedgwick on Statutory and Constitutional Law, 617. As the Constitution does not prohibit Congress to pass such a law, Congress may require or permit a State to insert such provision, if justice or sound policy requires, in its Constitution, preparatory to admission

into the Union; and if it is inserted and approved by Congress prior to the admission of the State, and applies to a class of contracts previously made, the Courts of the Union have no power to interfere and set aside such Constitution of the State, or any part of it, after it has been decided to be republican in form, and has been approved and accepted by the political power which alone has jurisdiction in such case, and whose decision it is the "duty of the Courts to follow."

But it does not follow, as the result of this doctrine, that there is no limit to the power of Congress in prescribing terms to a State applying for admission into the Union. Whenever a power is denied by the Constitution to both the Congress and the States, a provision in the State Constitution in violation of it, though dictated or approved by Congress prior to admission, would be null and void. As an instance, both Congress and the State are expressly prohibited by the Constitution to grant any title of nobility. As neither the State nor Congress has power to make any such grant, and as the action of the State attempting it would be void, Congress could not legalize that action, or give it any validity or force. But if Congress possessed such power, and the State, having no such power, inserted such a provision in her Constitution prior to admission into the Union, and Congress ratified and approved her action, and accepted her Constitution containing the provision, this would legalize it, and the Courts would have no right to interfere, and set aside the action of the State so ratified by Congress.

I think it very clear, from what has already been said, that the State of Georgia, under the dictation and with the approval of Congress, in the formation of a Constitution for the new State Government, had power to deny to her Courts, organized under said Constitution, and sworn to support it, all jurisdiction to enforce contracts for the price or hire of slaves, after slavery had been abolished by the State under the dictation of the conqueror, without compensation to the owners.

Did Congress sanction that part of the Constitution now under consideration? Unquestionably it did. The Consti-

tution formed by the Convention of the people of this State, and submitted to Congress for examination and approval, denied to all Courts under it jurisdiction to try or determine any suit against any resident of this State, upon any contract or agreement made or implied, or upon any contract made in renewal of any debt, existing prior to the first day of June, 1865.

To this general denial of jurisdiction, there were seven classes of exceptions. The seventh was in these words : " In all other cases in which the General Assembly shall by law give said Courts jurisdiction. *Provided,* that no Court or officer shall have, nor shall the General Assembly give, jurisdiction or authority to try, or give judgment on, or enforce, any debt, the consideration of which was a slave or slaves, or the hire thereof."

Congress, upon examination, and after mature deliberation, struck out the whole of said section relating to the denial of jurisdiction, except the said *proviso* to said seventh exception, and retained the *proviso* as part of the Constitution of the State. Thus, the provision now under consideration retains its position in the Constitution, with the marked and particular sanction and approval of Congress.

As Congress disapproved the Constitution submitted by the Convention of Georgia, called in obedience to the Acts of Congress, and amended it by striking out certain parts of it, which the Legislature of the State, which has no authority to make or amend a Constitution, and was elected for no such purpose, was required by Congress to sanction, it is evident that the Constitution under which we now live, and under which this Court is organized, is not the Constitution formed by the Convention, and ratified by the people of Georgia ; but it is the Constitution as amended and approved by the Congress of the United States, by virtue of their authority as the conquering power to dictate a form of government to the conquered, which is accepted by the people of the State as an act of obedience to the conqueror, and not as a matter of free will or voluntary sanction.

The present Constitution of this State having been dictated

Shorter *vs.* Cobb *et al.*

by Congress, as the representative of the conqueror, and accepted by the people of the State in obedience to the requirement of the conqueror, Congress is presumed to have sanctioned every word and line of it, which upon examination Congress did not, while amending it, require to be stricken out or changed. If then the obligation of the contract under consideration to pay money for slaves has been impaired, it was done by Congress and not by the State, and there is no violation of the tenth section of the first article of the Constitution of the United States, which does not apply to Congress.

But I do not desire to be understood as resting this case upon the strict letter of the law alone, or as intimating that Congress or the Convention has violated any principle of equity or justice, by inserting in the Constitution of this State the clause denying jurisdiction to the Courts to enforce any contract of this character. Their action can be defended not only upon solid legal principles, but in the forum of equity and good conscience. During the period of the war, rights of every character were destroyed, and property of every description swept away by the deluge of destruction which prostrated every interest before it; and it would be alike rigorous and unjust to hold that creditors were the only class whose property was *insured* against the contingencies and losses incident to the war ; that a bond, note, or mortgage was the only property too sacred to be touched, and too secure to be affected during the general wreck of fortunes, and ruin of families.

In my opinion, the rights of creditors in the conquered States, who had sold slaves, were no more sacred, and no more entitled to protection at the hands of Congress, in the formation of the new State Government under the Constitution of the United States, than were the rights of the slaveholders, many of whom were Union men to the last. And if the State of Georgia had the power, under the supervision, and with the sanction of Congress, to insert in her Constitution a provision destroying the rights of the loyal slaveholder without compensation, she had the same power, under the same

Shorter *vs.* Cobb *et al.*

sanction, to insert in her Constitution a provision denying to her Courts jurisdiction to enforce the collection of bonds, mortgages, or promissory note given for slaves. The one could be no more legally sacred than the other, and had no higher Constitutional guarantee for its protection.

The State has not pretended to destroy the obligation of this class of contracts. She has simply said, with the sanction of Congress in forming her new government, that *her* Courts shall have no jurisdiction to enforce them.

The supreme political power, with exclusive jurisdiction over the subject matter, acting within the scope of its authority, in creating a new State Government, and making a new Constitution for Georgia, having in the creation of her judiciary as part of that government thought proper to deny to all her Courts jurisdiction to enforce the class of contracts which is the subject matter of this litigation, the Judge of the Superior Court in this case, having taken a solemn oath to support said Constitution, did not err in refusing to assume jurisdiction which it expressly denies to said Court.

It is thesefore ordered that the judgment of the Superior Court be affirmed.

McCAY J., concurred, but furnished no opinion.

WARNER J., dissented. See his opinion in the next case.