STATE EX REL. ATTORNEY-GENERAL v. NOLAND KNIGHT.

(Filed 24 May, 1915.)

1. **Constitutional Law—Suffrage.**

  Suffrage is not a natural or inherent right, and being a privilege conferred by the State, the Constitution, Art. VI, sec. 1, by conferring this right upon males alone, excludes females from the exercise thereof.

2. **Same—Woman Suffrage—Males.**

  Article VI, sec. 7, only provides for the eligibility of voters to office, except those disqualified by Article VI, sec. 8, which latter section refers to males who deny the existence of God, or who have been convicted of crime; and while the word "persons" appearing in said section 8 is comprehensive enough to include women, by correct interpretation it properly refers to males upon whom the right to vote is conferred by Article VI, sec. 1, with the disqualification stated in section 8, and the maxim, *Expressio unius est exclusio alterius*, obtains.

3. **Constitutional Law—Public Offices — Notaries Public — Interpretation of Statutes.**

  The position of notary public is a public office, so recognized by common law and by proper interpretation of the Revisal, secs. 2347, 2348, 2350, 2351, and 2352, and so regarded by the various departments of our State Government, inclusive of the decision of the Supreme Court, until the enactment of chapter 55, Public Laws of 1915.

4. **Constitutional Law—Public Office—Oath of Office—Test—Notaries Public.**

  The requirement of an incumbent to take the oath to support the Constitution is not held to be the test of whether a position under the State Government is an office, but, were it otherwise, the position of notary public requires this oath, and it would nevertheless be an office within the meaning of the Constitution.

5. **Constitutional Law—Public Office—Extent of Duties—Test—Notaries Public—Judicial Acts—Clerks of Courts—Certificates.**

  The extent of the power exercised by one holding a public position is not determinative of the question of whether such position is an office within the meaning of the State Constitution, but whether the power in fact exists; and in many respects the functions exercised by a notary public are of a judicial character (Revisal, sec. 2359), and objection that such are exercised alone by the clerk in certifying and adjudicating the probate is untenable.

6. **Constitutional Law — Public Office—Notaries Public—Trust and Profit— Woman Suffrage—Legislative Power.**

  All offices, whether named by the Legislature or by the Constitution, fall within one of the departments of the State Government and exist under the Constitution and subject to its restrictions; and the position of notary public being a public office, within the meaning of the Constitution, the Legislature are without authority to declare it only a "place of trust and profit," and thus enact that women, who are not voters and therefore ineligible to hold an office, may qualify. to the position of notary public. *Semble*, the Legislature has not made any change in the law by stating that the position of notary public is a place of trust and profit.

**7. Constitutional Law—Legislative Acts—Interpretation—Power of Courts.**

It is required of the courts in the exercise of their sworn duty, to uphold the Constitution of the State, and when the constitutionality of a legislative act is questioned, the courts will place the act side by side with the Constitution, with the purpose and desire to uphold the act if it can reasonably be done; but if there be an irreconcilable conflict between the two, to that extent will the act be declared unconstitutional.

CLARK, C. J., dissenting; BROWN, J., dissenting in part.

APPEAL by plaintiff from *Webb, J.,* at March Term, 1915, of BUNCOMBE.

This is an action instituted by the State upon the relation of the Attorney-General against the defendant, a married woman, to inquire into and test her right to hold the position of notary public under chapter 12 of the Public Laws of 1915, which provides: "That the Governor is hereby authorized to appoint women as well as men to be notaries public, and this position shall be deemed a place of trust and profit, and not an office."

There was a judgment in favor of the defendant, and the State appealed.

*T. W. Bickett, Attorney-General, for the State.*
*Martin, Rollins & Wright and John A. McRae for defendant.*

ALLEN, J. There are five questions directly or indirectly involved in this appeal:

1. Is a woman voter in North Carolina?
2. If not a voter, is she eligible to office?
3. Is the position of notary public a public office?
4. If an office, can the General Assembly affect its character by calling it a "place of trust and profit," without changing its functions?
5. Has this Court the power to say that the General Assembly has exceeded its authority, and that the act passed by it is unconstitutional?

The right to hold the position of notary public is of slight moment to the women of the State or to the public, but it is of supreme importance that these questions shall be correctly decided, because they involve constitutional principles, and we approach their consideration mindful of our duty to declare what the law is, and not what we would have it to be, and of our obligation to maintain and uphold the Constitution until it is changed by the people, in whose hands the power of amendment rests.

1. *Is a woman a voter in North Carolina, and can she be one without constitutional amendment?*

The law writers agree that the right of suffrage is not a natural or inherent right, and that it is a privilege conferred by the State.

Judge Cooley in his treatise on Constitutional Law, page 260, says: "Suffrage cannot be the natural right of the individual, because it does not exist for the benefit of the individual, but for the benefit of the State itself. Suffrage must come to the individual, not as a right, but as a regulation which the State establishes as a means of perpetuating its own existence, and of insuring to the people the blessings it was intended to secure. Suffrage is never a necessary accompaniment of State citizenship, and the great majority of the citizens are always excluded, and are represented by others at the polls"; and in 15 Cyc., 280, the editor sums up the authorities in the following statement of the law: "In all periods and in all countries it may be safely assumed that no privilege has been held to be more exclusively within the control of governmental power than the privilege of voting, each State in turn regulating the subject by sovereign political will. The right of suffrage once granted may be taken away by the exercise of sovereign power, and if taken away, no vested right is violated or bill of attainder passed. None of the elementary writers include the right of suffrage among the rights of property or of person. It is not an absolute, unqualified personal right, but is altogether conventional. It is not a natural right of the citizen, but a franchise dependent upon law, by which it must be conferred to permit its existence."

If, therefore, the right to vote is not a natural right, but one conferred by law, only those can exercise the privilege upon whom it is conferred, and when we turn to our Constitution, Article VI, section 1, we find it provided that "Every male person born in the United States, and every male person who has been naturalized, 21 years of age, and possessing the qualifications set out in this article, shall be entitled to vote at any election by the people in the State, except as herein otherwise provided"; and as the privilege of voting is not a natural right and is conferred on males alone, this, of course, excludes females.

The exact question was considered in *Spencer v. Board,* 29 A. R., 582; *Gougar v. Timberlake,* 148 Ind., 38, and in *People v. Barber,* 48 Hun., 198, and it was held in each that women are excluded from voting under a constitution which confers the right to vote on males; and in *Minor v. Hoppersett,* 88 U. S., 162, the whole decision rests upon the assumption that this is the law.

2. *If not a voter, can a woman hold office in North Carolina?*

We turn again to the Constitution, and find it provided in Article VI, section 7, that "Every voter in North Carolina, except as in this article disqualified, shall be eligible to office," and the construction placed upon this section by our Court in an opinion written by *Chief Justice Clark* in *Pace v. Raleigh,* 140 N. C., 65, is that no one can hold office who is not a voter. He says in that case: "Nor have we been inadvertent to the

fact that under the former constitutional provision one who was an elector, that is, qualified to register, was eligible to office, though not registered, and that under the amendment no one is eligible to office unless he is a voter."

The language, "except as in this article disqualified," refers to voters (males) who deny the existence of God, or who have been convicted of crime. (Art. VI, sec. 8.) In other words, voters are eligible to office except as *they* are disqualified, and the word "persons" appearing in section 8, while comprehensive enough to include women, only applies to voters, as they are the only persons referred to in the article.

This is the construction placed on these sections of the Constitution in *Lee v. Dunn,* 73 N. C., 602, which is cited with approval in *State ex rel. Attorney-General v. Bateman,* 162 N. C., 588. The Court says: "The Constitution, Art. VI, sec. 1, prescribes the qualification of voters to be as follows: 'Every male person, etc., 21 years old or upwards, who shall have resided in this State twelve months next preceding the election and thirty days in the county in which he offers to vote, shall be deemed an elector.'

"The fourth section is as follows: 'Every voter, except as hereinafter provided, shall be eligible to office,' etc.

"The exception above is contained in the fifth section, as follows: 'The following classes of persons shall be disqualified for office: First, all persons who shall deny the being of Almighty God. Second, all persons who shall have been convicted of treason, perjury, or of any other infamous crime, or of corruption or malpractice in office, unless such person shall have been legally restored to citizenship.'

"So that every voter who does not deny the being of God, and has not been convicted of crime, is eligible to office in this State. And this comes so near including every man that it may be said that almost every man is eligible to office; that is to say, is electable, if the people choose to elect."

This statement of the law is in accord with authority elsewhere.

In Mechem on Public Officers, sec. 64, the author says: "The right to hold a public office under our political system is not a natural right. It exists, where it exists at all, only because and by virtue of some law expressly or impliedly creating and conferring it"; and in section 69: "Where no limitations are prescribed, however, the right to hold a public office under our political system is an implied attribute of a citizen and is presumed to be coextensive with that of voting at an election held for the purpose of choosing an incumbent of that office; those and those only who are competent to select the officer being competent to hold the office"; and in *S. v. Murray,* 28 Wis., 96, the Court says: "We have already seen that the grounds upon which a person not an elector is

excluded from holding public office is that the powers and functions of a free and independent government must be exercised by those by whom such government was instituted, that is, by the electors thereof. So if a person who is not an elector attempts to exercise the functions of a public office, the courts, upon proper proceedings being instituted for that purpose, will oust him."

This conclusion that only voters are eligible to office under our Constitution is an application of the maxim, *Expressio unius est exclusio alterius,* of which the Supreme Court of Illinois said, in *People v. Hutchison,* 172 Ill., 498, quoting from *S. v. Wrightson,* 56 N. J. L., 201: "In the construction of statutes it is a cardinal rule, which applies as well to constitutional provisions, that when the law is in the affirmative, that a thing shall be done by certain persons or in a certain manner, this affirmative matter contains a negative that it shall not be done by other persons or in another manner, upon the maxim, *Expressio unius est exclusio alterius.* 1 Plow., 206; 9 Bac. Ab., 235; Sedg. Stat. Con., 30."

Under this rule, as the Constitution says affirmatively that "Every voter, etc., shall be eligible to office," the affirmation contains the negative that no one except a voter can hold office.

It follows that as a woman is not a voter, she is not eligible to office.

3. *Is the position of notary public an office?*

What is the definition of notary public as given by the lexicographers? Black's Law Dictionary: "A public office whose functions are," etc. Bouvier's Law Dictionary: "An officer appointed by," etc. The Century: "A public officer authorized," etc. Webster: "A public officer who," etc.

What do the text-writers on the law say? Mechem on Public Officers, sec. 47: "A notary public is a public officer." 21 A. and E. Enc. Law, 555: "The office of a notary public is a public office." 29 Cyc., 1068: "The office of a notary public has long been known both to the civil and to the common law. It exists and is recognized throughout the commercial world, and has been said to be 'known to the law of nations.' It is a public office, being in most of the States a State office, although in few States it has been regarded as a county office, and its functions, once simple, have now a wider scope."

That the position was recognized as an office at common law is shown by the following, taken from 5 Comyn's Dig., 140, when speaking of protests of bills of exchange: "The protest must be made by a public notary upon all foreign bills of exchange, because he is a *public officer* to whom credit is given"; and by the opinion of *Buller, J.,* in *Lefty v. Mills,* 4 T. R., 175 (1791), that "The demand of a foreign bill must be made by a notary public, to whom credit is given, because he is a *public officer.*" (Italics ours.)

What is the opinion of the judges?

In each of the following cases it is held that a notary public is a public officer: *Emmerling v. Graham,* 14 La. Ann., 389; *S. v. Davidson,* 92 Tenn., 531; *Loan Co. v. Turrell,* 19 Ind., 469; *Opinion of Justices,* 150 Mass., 586; *S. v. Hodges,* 107 Ark., 272; *Pierce v. Indseth,* 106 U. S., 546; *Ohio Natl. Bank v. Hopkins,* 8 App. Cases (D. C.), 146; *Kirksey v. Bates,* 7 Porter (Ala.), 529; *S. v. Adams,* 58 Ohio, 612; *Grevnor v. Gordan,* 15 Ala., 72; *Sanfield v. Thompson,* 42 Ark., 46; *Smith v. Meador,* 74 Ga., 416; *Browne v. Bank,* 6 S. and R. (Pa.), 484; *Keeny v. Leas,* 14 Iowa, 546; *Britton v. Nichols,* 104 U. S., 766; *People v. Rathbone,* 135 N. Y., 434; *Bettmen v. Warwick,* 108 Fla., 47; *Ashcraft v. Chapman,* 38 Conn., 232; *Opinion of Justices,* 73 N. H., 621; *S. v. Clarke,* 21 Nev., 335; *Charst v. Transit Co.,* 115 Mo., 409; *Carroll v. State,* 58 Ala., 396.

We quote from only a few of these citations, but all are to the same effect.

In the case from Connecticut *Chief Justice Butler* says: "Notaries were originally mere commercial scriveners. Becoming important to the commercial world, their appointment was provided for and their duties regulated by public law, and they became sworn public officers."

In the case from New York: "The very designation of 'notary public' indicates a relation the office sustains to the body politic. It is impossible to regard him as other than a public officer."

In the case from Indiana: "A notary public is a public officer. The office originated in the early Roman jurisprudence, and was known in England before the Conquest."

In the case from District of Columbia: "It is a well known attribute of a notary public that he is a public officer, recognized as such by the common law and the law of nations."

In the case from 106 U. S., 546: "The Court will take judicial notice of the seals of notaries public, for they are officers recognized by the commercial law of the world."

The executive, legislative, and judicial construction in this State also favors the view that the position of notary public is a public office:

The executive, because until the last General Assembly met no woman had been appointed by the Governor a notary public, except in one instance, and then by mistake, as only the initials of the person applying for appointment were given, and when the mistake was discovered the commission was withdrawn.

The legislative, because for more than one hundred years the position has been spoken of in the statutes as an office.

The earliest reference to the position we have been able to find is in the Acts of 1777, vol. 1, Laws of N. C., ch. 118, sec. 15, which provides

that "The Governor, for the time being, shall  .  .  .  appoint one or more persons  .  .  .  to act as notary or notaries,  .  .  .  who shall take the oath appointed to be taken for the qualification of *public officers* and also an oath of office."

In the Revised Statutes of 1836-7 it is provided that "The Governor may, from time to time, at his discretion, appoint one or more fit persons in every county to act as notaries, who, on exhibiting their commission to the county court of the county in which they shall act, shall be duly qualified by taking before said court an *oath of office* and the oaths prescribed for *officers.*" This section was reënacted in the Revised Code of 1854, ch. 75, sec. 1, and in the Revisal of 1905, sec. 2347, except in the latter act it is added: "who shall hold *their office* for two years from and after the date of their appointment." (Italics ours.)

By the judicial, because in *Long v. Crews,* 113 N. C., 256, it was held that the probate of a deed in trust before a notary public who was a preferred creditor was invalid, upon the principle of the common law that no one can sit in judgment upon his own cause, and the present *Chief Justice,* writing the opinion, says for the Court: "The attempted acknowledgment of the deed in trust before a notary public who was a preferred creditor therein *was before an officer* disqualified to act, and hence a nullity," and the same learned judge says, in *Smith v. Lumber Co.,* 144 N. C., 49: "That the *officer, here a notary public,*" and in his concurring opinion in *Nicholson v. Lumber Co.,* 160 N. C., 37: *"It cannot be doubted that a notary public is a public office."* (Italics ours.)

The only expression we have found in our reports apparently in conflict with these authorities is in *Worthy v. Barrett,* 63 N. C., 199, in which an opinion of the Attorney-General of the United States of 1867 is quoted, which classifies notaries public among those positions that are not offices.

The case of *Worthy v. Barrett* was this: Worthy was elected sheriff of Moore County in 1868, and the commissioners of the county refused to induct him into office because he had been sheriff of the county before and during the war, and the question presented to the Supreme Court was whether he was an officer within the meaning of the Reconstruction Acts, and therefore disqualified until his disabilities had been removed.

The Court held that he was an officer because he was required to take an oath to support the Constitution, saying: "The oath to support the Constitution is the test," and quoted the opinion of the Attorney-General in support of this position, because he said in his opinion, in speaking of county offices: "I have arrived at the conclusion that they are subject to disqualification if they were required to take as part of their official oath the oath to support the Constitution of the United States."

We do not concur in the view that the oath to support the Constitution is the test, but if this should be adopted and the point decided in this case of *Worthy v. Barrett* approved, it would be decisive against the defendant, because notaries public, both before and since the act of 1915, now under consideration, have been and are required to take an oath to support the Constitution.

The opinion quoted in the case by the Attorney-General of the United States, that notaries are not public officers, is also in direct conflict with the opinion of the Supreme Court of the United States in *Pierce v. Indseth,* 106 U. S., 546, thereafter decided, that notaries "are officers recognized by the commercial law of the world."

The case of *Lawrence v. Hodges,* 92 N. C., 672, has, in our judgment, no bearing upon the question involved in this appeal. It was held in that case that it was competent for the Legislature to authorize clerks of the Superior Court to act as notaries public, and this is no more than an application of the principle stated by *Associate Justice Brown* in *Mc-Cullers v. Comrs.,* 158 N. C., 80, of simply annexing additional powers and duties to an office already existing. He says, among other things: "This legislation is not novel in North Carolina. . . . In 1901 the Legislature passed a similar act. . . . We also have the familiar case of the Governor, who is made by law a trustee of the University of the State and chairman of the board, and is required to perform these duties and also act as chairman of the executive committee of the trustees. . . . In West Virginia the law requires the Governor, Auditor, Treasurer, Superintendent of Schools, and Attorney-General to serve on the Board of Public Works, and prescribes the duties of said board. The Court of Appeals in an elaborate opinion held the act valid, saying, in substance, it simply prescribes additional powers to be performed by officers already elected by the people, and that it does not amount to an appointment to an office created by law, but that it only amounts to requiring the officers of the executive department, by virtue of their respective offices to which they have been elected by the people, to act as members of the Board of Public Works; that it in substance simply annexes additional powers and duties to their respective offices. . . . We could multiply authorities in support of these views."

We have no means of knowing the opinion of the Attorney-General of the State except from his public conduct and public utterances. He is a plaintiff in the action, and filed a complaint alleging that the defendant was unlawfully using the powers and duties of the position of notary public, and, when there was an adverse judgment against him in the Superior Court, appealed to this Court, and upon the argument strenuously insisted that the act of the General Assembly passed in 1915 was invalid if the position of notary public was a public office prior to its

enactment, and that the only debatable question was whether it was a public office, and he cited perhaps twenty authorities holding the position to be a public office.

The Governor has declined to make more than one appointment until the courts have determined the validity of the act.

We have, then, the opinion of a General Assembly which refused to pass the act until the Governor had agreed that he would make only one appointment before its constitutionality was determined; the opinion of the Governor, who has made only one appointment, and then for the purpose of presenting the question to the courts, and the opinion of the Attorney-General, if he has given one, who is a plaintiff in the action and is seeking to oust the defendant from office.

Is it not clear that these officials have not expressed any opinion, and that they have simply acted so that the question might be considered, and have placed the responsibility of final decision upon the courts?

It is but fair and just to the Attorney-General to say that he has acted in this matter as he has in all others coming before our Court. He is always candid and presents his contentions with learning and ability; but he feels that it is his duty to give the Court the benefit of all authority he finds, whether in support of his contention or not.

It is also suggested that women are admitted to practice law in this State, and that lawyers are officers and are required to take oaths to support the Constitution, and, in addition, an oath of office; but as is said in 4 Cyc., 898: "An attorney does not hold an office in the constitutional or statutory sense of that term, but is an officer of the court, exercising a privilege or franchise."

If, however, we discard the definition of the term and the opinion of the law writers and of the judges, and the construction placed upon it by the different departments of State, and apply the test of the functions to be performed by the incumbent of the position, we reach the same conclusion.

In Mechem on Public Officers, sec. 1, it is said that an office is "a public position to which a portion of the sovereignty of the country, either legislative, executive, or judicial, attaches for the time being, and which is exercised for the benefit of the public," and this definition was adopted and approved in a unanimous opinion of this Court in *State ex rel. Wooten v. Smith,* 145 N. C., 467, and again at this term in *Groves v. Barden, ante,* 8, and in the latter case it was also said that the performance of an executive, legislative, or judicial act is the test of a public office.

The extent to which the power may be exercised is not material. It is the fact that the power exists which is determinative. It was held in *Midgett v. Gray,* 159 N. C., 443, by the unanimous opinion of the Court,

that the position of school committeeman is a public office, and although the scope of the duties are confined, the position was regarded of such importance that its acceptance vacated the office of clerk of the Superior Court under the constitutional provision forbidding the holding of two offices.

One of the duties which a notary public may perform is taking the probate of deeds, and this is a judicial act.

In *Paul v. Carpenter*, 70 N. C., 508, *Rodman, J.*, speaking for the Court, says: "To take the acknowledgment and privy examination of a *feme covert* to a deed conveying her land is a judicial act"; and in *White v. Connelly*, 105 N. C., 68, *Associate Justice Clark* says: "Admitting to probate is a judicial act," and this is approved in *Piland v. Taylor*, 113 N. C., 1, and in *Long v. Crews*, 113 N. C., 256.

"The officer who takes an acknowledgment (of the execution of a deed) acts in a judicial character in determining whether the person representing himself to be, or represented by some one else to be, the grantor named in the conveyance actually is the grantor. He determines further whether the person thus adjudged to be the grantor does actually and truly acknowledge before him that he executed the instrument." *Wasson v. Connor*, 54 Miss., 352. "It is well settled that the certificate of a judge or a justice of the peace of the acknowledgment of a deed or mortgage is a judicial act. Conceding such to be the effect of a certificate of a judge or justice, yet it was contended on the argument that like effect should not be given to the certificate of a notary. Why not? He is a public officer, commissioned by the Governor. He is acting under oath, like other officials in the performance of judicial duties. Whatever officer is authorized to take the acknowledgment, to him is given a judicial act." *Com. v. Haines*, 97 Pa. St., 228.

The defendant contends, however, that if it is conceded that the probate of a deed is a judicial act, the judicial function is performed by the clerk, and not by the notary public; that the notary takes and certifies the evidence, and the clerk upon this certificate adjudicates the probate.

The authorities are, in our opinion, against this position. In section 989 of the Revisal it is provided that "The execution of all deeds of conveyance, etc., may be proven or acknowledged before any one of the following officials of this State: the several justices of the Supreme Court, the several judges of the Superior Court, commissioners of affidavits appointed by the Governor of this State, the clerk of the Supreme Court, the several clerks of the Superior Courts, the deputy clerks of the Superior Courts, the several clerks of the criminal courts, notaries public, and the several justices of the peace."

In this section notaries are not only classified among the *officials of the State*, but among its judicial officers, and all acquire jurisdiction to

take the proofs and acknowledgments of deeds from the same source and in the same language.

If so, by what rule of construction can it be said that a judge or clerk is exercising a judicial power when taking the proof or acknowledgment of a deed, and that a notary is not?

Again, the respective duties of the notary public and the clerk in admitting to probate, when both act, show that the notary is required to exercise discretion and judgment, while the duties of the clerk are mechanical and clerical.

The notary is not required to certify the evidence, but "to take and certify the acknowledgment or proof" (Rev., sec. 2359), and this imposes upon him the duty of ascertaining (1) that the persons who present themselves are the grantors in the deed; (2) that they acknowledge the execution of it; (3) that the wife signed the deed freely and voluntarily, and that she voluntarily assents thereto; while, on the other hand, the clerk is only required to examine the certificate and adjudge that it is correct and order registration, which only renders it necessary to compare the certificate of the notary with the form prescribed by statute for the purpose of seeing if they are substantially alike.

This position is, we think, fully sustained by *Young v. Jackson,* 92 N. C., 147, and *Darden v. Steamboat Co.,* 107 N. C., 446, in which it was held that the probate and registration of a deed was valid without an adjudication by the clerk that it was in due form and without an order of registration, this requirement of the statute being held to be directory.

In the *Jackson case* the Court says: "The important thing required with a view to registration is that the deed or other instrument requiring registration shall be proven before a tribunal or officer authorized by law to take and certify the probate"; and in the *Darden case:* "We therefore hold that where an acknowledgment or proof of the execution of a deed or other paper required or allowed to be registered is lawfully taken by any officer other than the clerk of the Superior Court of the county where the land lies, it is not essential to the validity of its registration that the latter should add an adjudication or order of registration to the certificate and fiat of the officer taking the probate."

It is true that in both of these cases the probate was taken before a clerk of the Superior Court, but in a county other than that in which the land was situate, and the authority of such officer in regard to probate is derived from the same source as is the authority of a notary, and is no greater, and the cases make no distinction between the positions in this respect, the language in one of the cases being "before a tribunal or officer," and in the other, "before any officer." These cases were decided before the enactment of section 999 of the Revisal, but that does not affect them as authority for the position that taking proof is judicial.

If, therefore, admitting to probate is a judicial function, and the duties imposed upon the clerk are directory and not mandatory, it would seem that the performance of the judicial act is with the notary.

There is no conflict between these decisions and the case of *Evans v. Etheridge,* 99 N. C., 47, because in the latter case the Court was dealing with the certificate of a commissioner of affidavits of another State under a statute which required the clerk, when acting upon the certificate of a commissioner, to "adjudge such deed or other instrument to be duly acknowledged or proved in such manner as if made or taken before him."

Another important function of a notary public is the power to protest commercial paper, and here his act, attested by his notarial seal, is recognized at home and abroad, because he is a public officer, and the maxim, *Omnia presumuntur esse rite acta,* which is applied to the acts of officers and not to those of the private individual, prevails. "The protest must be made by a notary public upon all foreign bills of exchange, because he is a public officer to whom credit is given." 5 Comyn's Dig., 140. "The demand of a foreign bill must be made by a notary public, to whom credit is given because he is a public officer." *Lefty v. Mills,* 4 T. R., 175. "The notary is a public officer commissioned by the State, and possessing an official seal, and full faith and credit are given to his official acts, in foreign countries as well as his own." 2 Dan. Neg. Inst., sec. 934. "Notaries are public officers of the whole commercial world." *Sanfield v. Thompson,* 48 A. R., 51.

"As public officers, notaries are entitled to the presumption of law in their favor that they have performed their duty, unless the contrary appears. . . . Every intendment is to be in favor of the fair performance of his duty by the notary." *McAndrew v. Radway,* 34 N. Y., 514.

Again, we said in *Groves v. Barden* that while the final test of an office was the performance of a judicial, executive, or legislative act, that there were the following evidences as to the character of the position: "That an oath to support the Constitution is required, or that a bond for the faithful performance of duties must be executed, or that the duties are prescribed by law and not regulated by contract, or that the incumbent discharges independent duties and is not acting under the direction of others, or that the duties are permanent in their nature and not occasional and intermittent, and that the term is fixed and continuing and not temporary, or that the position is named an office or an employment in the statute creating it."

It will be found upon comparison that all these evidences were present as to the position of notary public prior to the passage of the act now before us, except the giving of a bond.

He is required to take an oath to support the Constitution; his duties are prescribed by law and not regulated by contract; he performs inde-

pendent duties and does not act under the direction of others; his duties are continuing and permanent; the term is fixed, and, until the last General Assembly met, the position had been called an office in all legislative acts since 1777.

It is also evident that in the opinion of the General Assembly of 1915 it was an office. If not, why pass the act at all? The Governor has power under the general law to appoint notaries, and if not an office, he could have appointed women to the position before the act was passed; and if this was the opinion of the General Assembly, that it was not an office, the act is no more than a suggestion or advice to the Governor. It was because the position was known and recognized as an office that the words were added to the act, "and this position shall be deemed a place of trust and profit, and not an office," meaning it is an office now, but "shall be" hereafter a place of trust and profit.

It is also significant that the General Assembly, in passing the act of 1915, did not undertake to amend chapter 55 of the Revisal, entitled "Notaries," and it leaves that chapter unimpaired, unless repealed by implication.

That chapter provides: "The Governor may . . . appoint one or more fit persons in every county to act as notaries, who shall hold their office for two years . . . and shall be duly qualified by taking before said clerk an oath of office and the oaths prescribed for officers" (sec. 2347); "The Governor shall issue to each a commission" (sec. 2347); "Notaries public shall have power to take and certify the acknowledgment or proof of deeds, etc.; to take depositions and to administer oaths and affirmations in matters incident to or belonging to the duties of their offices; and to take affidavits to be used before a court, judge, or other officer within the State, and shall have full power to take the privy examination of *femes covert*" (sec. 2350); "Notaries public shall have full power and authority to perform the functions of their office in any and all counties of the State, and full faith and credit shall be given to any of their official acts" (sec. 2350); They are required to state after their official signature the date of the expiration of their commissions, but the failure to do so shall not thereby invalidate "their official acts" (sec. 2351); "Official acts by notaries shall be attested by their notarial seals" (sec. 2352).

It seems, therefore, to be established, by every test that can be applied, that heretofore the position of notary public has been a public office.

*4. If an office, can the General Assembly, by calling it a "place of trust and profit," without changing the functions, affect its character?*

The contention of the defendant is that as the position of notary public is not named in the Constitution, and is created by statute, that the qualifications for holding office named in the Constitution do not apply

to it, and that the General Assembly may determine who can hold the position. In other words, that as the position is created by the Legislature, the constitutional provision as to holding office does not apply to it.

We cannot approve this position without following it to its logical conclusion, and to do so it must be applied to all offices not named in the Constitution and created by legislative act, and as to them we must hold that the Legislature may call them "places of trust and profit" and say who may hold them, without regard to the Constitution.

There is no such classification of offices as large and small, and we cannot yield to the suggestion that the position of notary public, if an office, is not of great importance, and that therefore we may hold that the constitutional qualifications for office do not apply to that position and stop, because when this case is decided it becomes a precedent, and as said by Disraeli, "A precedent embalms a principle." If the principle is not safe and sound, we may well adopt the words of Portia, who replied, when urged to do a little wrong that great good might come of it.

> 'Twill be recorded for a precedent;
> And many an error by the same example,
> Will rush into the State. It cannot be.

Let us, then, see to what conclusions the principle naturally and inevitably leads, and, first, as to the offices to which it must be applied.

We find among the offices created by legislative act, now in existence, and not mentioned in the Constitution, three Corporation Commissioners, a Commissioner of Agriculture, an Insurance Commissioner, a Commissioner of Labor, the directors and superintendent of the State's Prison, the State Librarian, the Marshal of the Supreme Court, the Keeper of the Capitol, the members of the Historical Commission, the Assistant Attorney-General, mayors, aldermen, police justices, and constables; and, if the position of the defendant is sustained, the General Assembly may call all of these "places of trust and profit" and may say that women can hold them.

This would produce an anomalous condition, as a woman could hold the position of Commissioner of Agriculture, because created by the General Assembly, and could not be Superintendent of Public Instruction, because named in the Constitution; she could be a Corporation Commissioner and not a coroner; she could be Insurance Commissioner and not a county surveyor.

This, however, would not be the end, because if the principle is once admitted that the provisions in the Constitution as to qualifications for office do not apply to offices created by the General Assembly, it follows logically that the qualifications for voters in the Constitution do not apply to such offices, and the General Assembly would not only have the power to say that women could vote for all of these positions, but it could

also strike down the educational and other qualifications of voters as to these offices, because the contention is as to offices created by the Legislature that they are under the control of the Legislature and not under or bound by the limitations in the Constitution.

· This would be in direct conflict with the decision in *Van Bokkelen v. Canady,* 73 N. C., 198, in which the Court had under consideration Article VI, section 1, of the Constitution of 1868, of which Article VI, section 1, of the present Constitution is an exact copy, and it was there held that the qualifications of electors prescribed by the Constitution applied to all elections, the Court saying: "The Constitution provides that every male person 21 years old, resident in the State twelve months and in the county thirty days, shall be an elector (Art. VI, sec. 1). An elector for what? The Constitution does not say for what. Does it mean for President, or for members of Congress, or for Governor, or for judges, or for members of the General Assembly, or for county officers, or for township or town officers, or for what else? There it stands by itself, without explanation; that every such person shall be an elector—a voter. It evidently means to designate those persons as a *class,* to vote generally whenever the polls are opened and elections held for anything connected with the General Government or the State or local government."

Again, this construction would place it in the power of the General Assembly to nullify Article XIV, section 7, of the Constitution, forbidding the holding by one person of two offices, because the Legislature could simply say that a particular position was not an office, but an employment, and thereby enable one to hold two positions now known as offices.

We cannot think that the framers of the Constitution intended such a result.

The Revolution of 1776 was largely a protest against the exercise of arbitrary power, and one of the principal reasons for adopting a written Constitution was that limitations should be placed upon the exercise of power, and it is said in our Constitution, Art. I, sec. 37, that "all powers not herein delegated remain with the people." The Constitution is intended to be permanent, and was adopted not only to meet conditions then existing, but for the future, and it was the purpose of the people that it should remain unimpaired until changed by the people themselves.

It is not an enemy to progress, but as it is the result of deliberate consideration and mature judgment, first expressed in convention and then approved by the people, it is so framed that it cannot be changed in a day; the people, then, agreeing upon the fundamental law for the present and the future, and knowing that times of agitation and popular clamor would come, while reserving the power of amendment, in their wisdom

imposed a restraint upon themselves by making the powers of amendment slow enough to give time for reflection before final action.

"What is a Constitution? It is the form of government, delineated by the mighty hand of the people, in which certain first principles of fundamental laws are established. The Constitution is certain and fixed; it contains the permanent will of the people, and is the supreme law of the land; it is paramount to the power of the Legislature, and can be revoked or altered only by the authority that made it.

"The life-giving principle and the death-doing stroke must proceed from the same hand. What are legislatures? Creatures of the Constitution; they owe their existence to the Constitution; they derive their powers from the Constitution. It is their commission, and, therefore, all their acts must be conformable to it, or else they will be void. The Constitution is the work or will of the people themselves, in their original, sovereign, and unlimited capacity. Law is the work or will of the Legislature in their derivative and subordinate capacity. The one is the work of the creator, and the other of the creature. The Constitution fixes limits to the exercise of legislative authority, and prescribes the orbit within which it must move. In short, the Constitution is the sun of the political system, around which all legislative, executive, and judicial bodies must revolve. . . . The Constitution is the origin and measure of legislative authority. It says to legislatures, Thus far ye shalt go, and no further. Not a particle of it should be shaken; not a pebble of it should be removed. Innovation is dangerous. One encroachment leads to another; precedent gives birth to precedent; what has been done may be done again; thus radical principles are generally broken in upon, and the Constitution eventually destroyed. . . . Omnipotence in legislation is despotic." *Vanhorne v. Dorrance,* 2 Dal., 304.

The functions of government were distributed in the Constitution among three departments, legislative, judicial, and executive, and all authority conferred by the people is exercised under one of these departments.

As new agencies are required, the General Assembly has the power to create them, and, when no longer necessary, to abolish them; but when created, they fall within one of the departments and exist under the Constitution and subject to its restrictions.

The language of the Court in *Worthy v. Barrett, supra,* in reference to the Constitution of the United States is applicable to our own Constitution, as the two are in this respect practically identical. The Court says: "The Government of the United States is divided into three branches—legislative, judicial, and executive. These three parts make one whole. There is no other part or parcel. It follows that there can be no office in the Government that is not in one of these departments. There can be no officer unless he be the incumbent of an office. There-

fore, there can be no officer except he be in some office in one of these three departments."

If they are not under the Constitution, by what authority do they exist? It cannot be that we are living as to a part of our Government under the Constitution, and as to another part outside the Constitution, without restrictions or limitations.

It is, however, doubtful if the General Assembly has made any change in the law by stating that the position of notary public is a "place of trust and profit."

In Article XIV, section 7, of the Constitution it is provided: "No person who shall hold any office or place of trust or profit," etc., shall hold or exercise any other office or "place of trust or profit"; and in construing this language it was said, in *Doyle v. Raleigh,* 89 N. C., 136: "It is apparent from the association that 'places of trust or profit' are intended which approximate to but are not offices, and yet convey the same general level in dignity and importance. The manifest intent is to prevent double officeholding—that offices and places of public trust should not accumulate in a single person; and the superadded words of 'places of trust or profit' were put there to avoid evasions in giving too technical a meaning to the preceding words." This was affirmed in *S. v. Smith,* 145 N. C., 477, in an opinion by *Justice Brown,* in which he adds: "The most important characteristic which distinguishes an office from a public agency is that the conferring of the office carries with it a delegation to the individual of some of the sovereign functions of the Government. In this respect the terms 'office' and 'places of trust,' as used in our Constitution, are synonymous."

Both of these cases were approved at this term by the unanimous opinion of the Court in *Groves v. Barden, ante,* 8.

It is, therefore, at least debatable, conceding the power to exist, if the General Assembly made any change in the position by calling it a "place of trust and profit."

Can we find a better definition of an office than that it is a "place of trust and profit"? In 29 Cyc., 1361, it is said that "An office in the abstract sense may be defined as a duty, charge, or trust, a place of trust, a position to which certain duties are attached."

If, however, other words had been used, we are of opinion that by merely giving it a name the General Assembly has not changed the character of the position. *Wood v. Bellamy,* 120 N. C., 212.

The last case cited (*Wood v. Bellamy*) is historical.

In 1896 there was a change of administration in the State, and a new political party came into power. The General Assembly of 1897 passed an act by which it attempted to give control to the new party of different State institutions, and, among others, of the State Hospital at Raleigh. Among other things, it was provided in the act that the board of direct-

ors having charge of the institution should be abolished and that the powers, rights, and duties heretofore prescribed by law to said board shall hereafter be granted to and imposed upon a board of trustees; and it was then further provided: "It is not the intention of the General Assembly that the trustees herein provided for shall be offices within the meaning of section 7 of Article XIV of the Constitution, and they are declared to be special trustees for the special purposes of this act."

The Court, speaking of this part of the act, said: "These places have been held to be offices, as we have declared in this opinion, and the Legislature by simply declaring that they are not to be offices does not change the nature of the thing. . . . It is idle, under the decision of this Court, to say that such a position as these defendants hold is not an office, as it would be to say that a horse is not a horse because one may choose to call him some other animal."

This principle was also fully recognized and approved at this term in *Groves v. Barden, supra,* in which it was held that the name given to a position by the General Assembly was evidence of the character of the position, *but that this "was not determinative or conclusive."*

The case of *Wood v. Bellamy* is one of the officeholding cases that was not overruled by *Mial v. Ellington,* 134 N. C., 131, as is shown by the concurring opinion of *Chief Justice Clark,* who also concurred in the opinion in *Wood v. Bellamy.* He says, at page 166: "In *Wood v. Bellamy* there was an application of *Hoke v. Henderson* in a case when new incumbents were placed in offices as to which there had been no change of duties, but a change of name only. This decision was within the limits of the original decision. It was the subsequent case, beginning with *Day's case,* 124 N. C., 362, which carried it further, causing it to be denied, and its ultimate and inevitable overthrow."

The inference seems to be clear that, in the opinion of the writer, *Wood v. Bellamy* was correctly decided, and that the character of a position is not affected when there is "no change of duties, but a change of name only."

It is true, there is language in the opinion in *Brown v. Turner,* 70 N. C., 93, which sustains the contention of the defendant that the character of the position is determined solely by the fact that it is, or is not, called an office in the legislative act; but this question was not before the Court.

The point in controversy and decided was as to the power of the General Assembly to abolish the office of Public Printer and to invest a joint committee of the House and Senate with the authority to contract for the public printing.

If, however, the case is regarded as authority, it is in direct conflict with the subsequent case of *Wood v. Bellamy,* and with *S. v. Smith,* 145

N. C., 476, and *Groves v. Barden, ante,* 8, both holding that the character of the position is determined by the functions to be performed, and not by the name.

It is also expressly declared in the latter case that "the fact that the lawmaking power may have declared the position an office or employment, although not conclusive, is entitled to consideration"; and we are asked to say, in direct opposition to that opinion, that as the General Assembly has said that the position of notary public is a place of trust and profit, and not an office, that this declaration is conclusive.

There are also a number of decisions from the courts of other States of eminent learning and ability, supporting the position of the defendant that the qualifications for holding office, prescribed by the Constitution, do not apply to offices created by the Legislature, and that as to such offices the Legislature may say who may fill them; but there are two insuperable objections to following them.

In the first place, these decisions are based on the constitutions of the respective States, and in no one of these constitutions can be found the provision which is in the Constitution of our State: "Every voter, except as in this article disqualified, shall be eligible to office"; nor has it been declared by the courts of those States, as it has been with us, that "No one is eligible to office unless he is a voter." *Pace v. Raleigh,* 140 N. C., 70.

In the next place, the doctrine that offices created by the General Assembly are not under the restrictions and limitations of the Constitution was repudiated in *State ex. rel. Atty.-Gen. v. Bateman,* 162 N. C., 588.

The office of recorder or police justice is not mentioned in the Constitution, and it owes its origin and existence to legislative action, and yet it was held in the *Bateman case* that the qualifications of the Constitution for holding office applied to it, and that the General Assembly did not have the power to say that the recorder should be a licensed attorney, because this was not a qualification named in the Constitution; and if this case stands and is authority, whatever else may be deduced from it, it cannot be held that offices created by the General Assembly are not under the Constitution and not controlled by its provisions.

We are, therefore, of opinion that the General Assembly has not changed the character of the position by calling it a "place of trust and profit," and that it exceeded its power when it declared that a woman could hold the position of notary public.

5. *If so, has this Court the power to say that the General Assembly has exceeded its authority and that the act passed by it is unconstitutional?*

The text-writers and the decided cases agree that it is not only within the power, but that it is the duty, of the courts in proper cases to de-

clare an act of the Legislature unconstitutional, and this obligation arises from the duty imposed upon the courts to declare what the law is.

The Constitution is the supreme law. It is ordained and established by the people, and all judges are sworn to support it. When the constitutionality of an act of the General Assembly is questioned, the courts place the act by the side of the Constitution, with the purpose and the desire to uphold it if it can be reasonably done, but under the obligation, if there is an irreconcilable conflict, to sustain the will of the people as expressed in the Constitution, and not the will of the legislators, who are but agents of the people.

The principle is well stated in 6 Ruling Case Law, 72, that "Since the Constitution is intended for the observance of the judiciary as well as the other departments of Government, and the judges are sworn to support its provisions, the courts are not at liberty to overlook or disregard its commands, and, therefore, when it is clear that a statute transgresses the authority vested in the Legislature by the Constitution, it is the duty of the courts to declare the act unconstitutional, and from this duty they cannot shrink without violating their oaths of office. The duty, therefore, to declare a law unconstitutional in a proper case cannot be declined, and must be performed in accordance with the deliberate judgment of the tribunal in which the validity of the enactment is directly drawn in question."

The first exercise of this power in this State was in 1787, in *Bayard v. Singleton*, 1 N. C., 42, and one of the latest was in 1912, in *Commissioners v. Webb*, 160 N. C., 594, in which an act was held unconstitutional by the unanimous opinion of the Court, written by the present *Chief Justice*.

In *Sutton v. Phillips*, 116 N. C., 504, in an opinion written by *Chief Justice Clark*, the Court says: "While the courts have the power, and it is their duty, in proper cases, to declare an act of the Legislature unconstitutional, it is a well recognized principle that the courts will not declare that this coördinate branch of the Government has exceeded the powers vested in it unless it is plainly and clearly the case"; and this language was approved and affirmed in the case of *In re Watson*, 157 N. C., 349.

In 1913 an act of the General Assembly was declared to be unconstitutional in *Asbury v. Albemarle*, 162 N. C., 248, and in *Sewerage Co. v. Monroe*, 162 N. C., 275, and in each case the judge of the Superior Court sustained the constitutionality of the act, and two members of this Court dissented, *Associate Justice Hoke* and the writer of this opinion.

Between these cases that are cited, running from the first volume of our Reports to the 160th, covering a period of one hundred and twenty-five years, there could be cited fifty or more cases in which acts of the

General Assembly have been declared unconstitutional, and we find no judicial opinion to the contrary.

The legislative and executive departments have recognized the existence of this power in the courts in the passage and execution of the act now before us, because it is a part of the history of the act that, after its introduction, the General Assembly hesitated and refused to take final action until assured by the head of the executive department that only one appointment would be made until the constitutionality of the act was passed upon by the courts.

We are, therefore, of opinion, upon the whole case:

1. That a woman is not a voter in this State.

2. That as she is not a voter, she is not eligible to office.

3. That the position of notary public is a public office.

4. That being a public office, the General Assembly cannot change its character by simply making a change in the name.

5. That the act of the General Assembly declaring that a woman may hold the office of notary public is unconstitutional and void.

Our State Government and the right to hold office are based on male suffrage, and if this policy is to be changed, it must not be done by the courts, as the power to amend is reserved to the people alone. If we exercise the power, we violate the Constitution we are required to support and maintain, and establish a precedent which will furnish an opportunity to change the policy of our Government in a way not contemplated by the Constitution.

We cannot hold that a woman may hold the office of notary public, and stop. If we take the first step, we must do so upon the principle that offices created by the General Assembly are not bound by the limitations of the Constitution, and if this principle is established, we must follow it to its legitimate and logical conclusion, and apply it to all offices created by the Legislature.

We have no right to deal with the question upon ground of sentiment or personal inclination.

Our duty is performed when we declare the law as we understand it to be, giving to the subject careful consideration and exercising our deliberate judgment, and it cannot be performed otherwise.

Neither the wisdom of extending the right of suffrage to women nor their fitness to hold office is remotely involved in this appeal. These are questions which must be submitted to and determined by the people.

We have not been inadvertent to the statistics which have been urged upon our consideration. These may be important upon the question as to the desirability of changing the Constitution, but cannot aid us in the construction of our written Constitution unless it is shown that in States where women are notaries the constitutions are like ours, and this has not been done.

In some of these States women are voters and can, of course, hold any office, and in others they have qualified and restricted suffrage, and in England there is no written Constitution.

The number of questions urged upon our consideration ·on the oral argument and in the briefs, some of them new and important, and the propriety of giving satisfactory reasons for denying a request or demand of woman, whether addressed to the individual or to the judge, have rendered it necessary to extend the discussion further than would otherwise be required.

Reversed.

CLARK, C. J., dissenting: There is but one question presented by this appeal.

The General Assembly of North Carolina at its late session enacted chapter 12, Laws 1915, as follows: "The Governor is hereby authorized to appoint women as well as men to be notaries public, and this position shall be deemed a place of trust and profit, and not an office."

Upon this authority from the lawmaking department of the Government, to whom by the Constitution that duty is intrusted, the Governor of the State issued his commission to Mrs. Noland Knight, the defendant, as a notary public. Thereafter this *quo warranto* proceeding was brought, averring that a notary public was not a place of trust or profit, as the Legislature had enacted, but was in truth an office, and therefore that the commission issued to her by the executive department of the State under the authority of the Legislature was a nullity because she was a woman.

The action was brought before *Judge Webb* of the Superior Court, who sustained the action of the General Assembly and of the Governor, and declined to hold their acts void. On argument in this Court, the Attorney-General, while he combated some of the propositions of the defendant's counsel, admitted that the act was valid, saying then, and also in a written opinion: "In the face of the legislative declaration, there ought not to be any serious trouble about the matter."

The sole question, therefore, is, after this action of the lawmaking department and the Governor, and the admission of the relator, the Attorney-General, himself, in open court, "Ought the defendant be deprived of her appointment?" There can, of course, be other questions, more or less collateral, discussed, but that is the sole question presented on this record. If she can be thus deprived, it can be done only upon the ground that the above acts of the Legislature and of the Governor are in violation of the Constitution. It cannot be contended that the Legislature acted ignorantly or unadvisedly. In that body there were many able men, among whom were lawyers of acknowledged prominence and recognized ability. They were under an oath to support the Constitution,

as much so as the members of this bench. No one will impute to that body a desire to evade or fraudulently circumvent the Constitution which they were sworn to support. No one has suggested that. The matter was fully discussed in both houses, was thoroughly understood, and the bill passed the General Assembly by a large majority in both houses.

If this Court deems it is its duty to so decree, it ought to point out the paragraph in the Constitution which gives it the power, in its opinion, to hold this action of the Legislature and the Governor in violation of the Constitution; for the Governor as well as the members of the General Assembly are under the sanction of an oath to maintain the Constitution. The act "authorized" but did not require him to appoint women notaries public.

The General Assembly of 1913 passed an act in almost identical terms authorizing the appointment of women as trustees upon the public school boards, and with the same provision, that such "position shall be deemed a place of trust and profit, and not an office." That act has been recognized without question and acted upon. One hundred and fifty women have been appointed to such positions and have discharged the duties thereof with credit to themselves and to the benefit of the public.

There is no provision of the Constitution which defines an "office," and none which creates the position of notary public. The Legislature, therefore, could not act in violation of the Constitution in drawing the line, as it did, between positions of trust or profit and offices. Certainly not, unless the duties of a notary public are of themselves so inherently an office and unless it has been so generally recognized as such that to term it not an office would be a fraud in legislation.

Every department of the State Government has always recognized that a notary public is not an office, for in this Legislature, as in preceding ones, several members were at the same time notaries. The Constitution forbids persons holding two offices at the same time. Art. XIV, sec. 7. Yet no Legislature has ever held that a member could not be a notary. The Governors (most of whom have been lawyers) have appointed members of the Legislature to be notaries while continuing to sit as members, and no court has ever held the act of any notary invalid because he continued to act as such while a member of a Legislature. The effect of the majority decision in this case may invalidate many instruments acknowledged before notaries, heretofore recognized as valid.

The words "office" and "public office" are very frequently used loosely without any intention to draw the line as to whether a position is an "office," a "place of trust or profit," or a "public employment," and it is due to that fact that many opinions have spoken of the position of notary public as an office. "Office" means simply a "duty," from the Latin word

*officium;* and as this position is called "notary public," it has been frequently, in casual writing of opinions, referred to as a public office.

But there has been no opinion of the Supreme Court of this State nor, it is believed, of any other State which has ever held the position to be a "public office" when the line was being drawn between "public offices" and "places of trust or profit" or "public employment." It is stated positively, after much research, that no court at any time, in any State or country whatever, has held the position to be a public office when there was an act of the Legislature decreeing it not to be a public office. In the *Opinion of the Judges,* 165 Mass., 599, the Court held that in that State the position of notary public was named and created by the Constitution, and, therefore the Legislature could not make it a "place of trust or profit" or a public employment merely, stating, however, that if the position was created (as it is in this State) by the Legislature, that body would be competent to make it such position as they saw fit.

In this State there have been two or three decisions which loosely refer to the position of notary public as an "office," but that was at the time when the statute referred to it as an office. It took its rank as an office from such statute, and if the General Assembly had the power to pass the act recognizing it as an office, the General Assembly of 1915 had the power to make it a "place of trust or profit." Nothing is better settled than that the act of one Legislature can be repealed or amended by a succeeding one. Neither act has any validity except as the organized expression of the public will of the time, which is subject to change or modification by any subsequent legislature.

In our own State this Court has followed (*Mial v. Ellington,* 134 N. C., 131) the decisions, universal elsewhere, that the Legislature has entire power over offices created, not by the Constitution, but by the Legislature itself (*Scown v. Scarnecki,* 164 Ill., and numerous cases there cited), and has said in words exactly applicable to the facts of this case (*Brown v. Turner,* 70 N. C., 100): "When the Legislature created and called it an office it was an office, not because the peculiar duties of the place constituted it such, but because the creative will of the lawmaking power impressed that stamp upon it; therefore, when that stamp was effaced by the repealing act it shrank to the level of an undefined duty. The authority that invested these duties with the name and dignity of a public office afterwards divested them of that name and dignity."

We have, however, had two instances in this State in which the question was sharply presented whether the position of notary public was an office or not, and in both it was held not to be, and in those cases only was the question squarely presented.

In 1867 it became an important matter to draw the line between what positions in this State were offices and what were not. The Attorney-

General of the United States, on 12 June, 1867, published his "considered opinion" (as our Court styled it), in which he defined what positions were offices and what public employments were not offices. The thirteenth paragraph in his opinion, after reciting what were "offices," says, as to those *"not* offices": "13. Persons who exercise mere agencies or employments under State authority are not disqualified, such as commissioners to lay out roads, commissioners of public works, visitors of State institutions, directors of State banks or other State institutions, *notaries public, commissioners to take acknowledgment of deeds, and lawyers."* That opinion of the Attorney-General of the United States·is quoted in full by our Supreme Court and adopted, *Worthy v. Barrett,* 63 N. C., at p. 203.

This Court subsequently and continuously down to this time has recognized its correctness, for this Court without question has been licensing women as lawyers, certainly a far more important position, and the statute requires that all lawyers must take an oath of office and an oath of allegiance both to the State and Federal Governments.

The only other case in which the point has been exactly presented was *Lawrence v. Hodges,* 92 N. C., 681. The Constitution, Art. XIV, sec. 7, provides: "No person who shall hold any office or place of trust or profit under the United States, or this State, or any other State, . . . shall hold or exercise any other office or place of trust or profit under the authority of this State." Revisal, 2349, provides: "The clerks of the Superior Court may act as notaries public in their several counties by virtue of their office as clerks, and may certify·their notarial acts under the seals of their respective courts." It cannot be contested that clerks of the courts are public officers created by the Constitution. If, therefore, the position of notary public was an "office" also, the same person could not hold both positions. The act of Congress required certain mortgages on vessels to be acknowledged before a notary public, and in *Lawrence v. Hodges* the question was presented whether the clerks were valid notaries public, and it was held in 92 N. C., at p. 681, that they were. It thus conclusively appears that in both the cases in which the point was presented the position of notary public was held not to be an office.

*McCullers v. Comrs.,* 158 N. C., 80, holding that the Governor and others can discharge certain functions *ex officio,* in no wise conflicts with *Lawrence v. Hodges.* If it did, all that would be necessary would be to provide that any woman who held the position of school trustee, to which she is eligible, can *ex officio* discharge the duties of a notary public. The position of "lawyer" has been often styled an "office," but women were admitted to the bar in this State because it was found that to hold that position an office would disqualify a large part of the Legislature and many other officeholders, State and Federal. While the statute incident-

ally refers to notaries public and lawyers as officers, there has been no express decision that a notary public is an office, till now.

But it has been argued by some that the position of notary public was an office at common law. If it had been, the common law is simply the English law, the largest part of which was the decisions of the English judges based upon their customs or the construction of their statutes, and of course subject to be changed at will by the Legislature of North Carolina in all matters that concern our self-governing people. In fact, however, a letter from Sir John Simon, at present Attorney-General of England, written in January of this year, says: "No act of Parliament has ever disqualified women from holding the position of notary public in this country, and it is very certain that none such could be passed." Even if it had been otherwise, it would not have disqualified the General Assembly of North Carolina from defining it to be a mere place of trust or profit, and authorizing women to hold it.

In *U. S. v. Bixby,* 10 Bizzell, 520, it was held by *Gresham, J.,* that "at common law a minor is eligible to the position of notary public." In Virginia, which naturally more nearly follows the English law than any other State in the Union, its Attorney-General says: "In this State any man or woman over 18 years of age can be a notary public."

But aside from any statute which (like our act of 1915) expressly makes the position "a place of trust or profit," or our previous statute, which, without expressly making it an office, merely required an oath of office (as is also required of lawyers, public administrators, and others who have been held to be not officers), the position in itself inherently is not an "office." The duties of a notary public are prescribed (Rev., 2350) and are purely those of certificate and analogous to those of a commissioner to take affidavit, and have in them no element of an office.

The decisions have all held that to be a "public office" as distinguished from a "place of trust or profit" or a "public employment" the officer must possess and exercise some of the sovereign powers of the State, either executive, legislative, or judicial. *S. v. Smith,* 145 N. C., 477, citing Mechem on Pub. Officers, sec. 1. A notary public cannot legislate. A notary cannot execute the law, and has no judicial functions. The duties of the position are simply to take down and certify evidence. For the purpose of certification, the notary has a seal, just as formerly any grantor in a deed had, to authenticate his act by his seal. This did not make every grantor a public officer. It is true that in certain rare cases a notary public has the power of contempt. So by statute has every referee in North Carolina (Rev., 492), but a referee certainly is not therefore an officer.

The entire experience and recognition of the rest of the world is against the position being *ex vi termini* a public office. In Massachusetts and in Ohio and one or two other States the position has been made

an office by the Constitution or a statute. After the passage of this act of our General Assembly an official inquiry was instituted as to the status of notary public in the other States. The replies from their judicial departments show that out of the fifty-three jurisdictions in the United States (*i. e.*, forty-eight States, the District of Columbia, and the territories of Alaska, Porto Rico, Hawaii, and the Philippines) women are competent to be notaries public in all except ten, and in those ten they were held incompetent either because, as in Massachusetts, the Constitution had made the position an office or a statute had made it an office, or, as in a few of them, "it had not been the custom to admit women to hold the place, and there was no statute as yet authorizing them to fill the position." In no case was there found, or reported, a decision holding women incompetent to fill the place when there was a statute authorizing them to do so, or providing that the position was not an office. Outside of these ten States (of our fifty-three jurisdictions) there is no country which disqualifies a woman to hold the position of notary public. There are semicivilized and barbarous countries in which they are allowed to hold no position whatever, and in those countries there is probably no such position.

There have been many cases in this Court, of course, holding acts of the Legislature unconstitutional. But no one has ever found express authority in the Constitution to do so, and it is claimed to exist by construction and inference of the courts in their own favor. This Court has, almost in every instance, therefore, wisely taken the pains to say that it will not exercise this assertion of supreme power in setting aside the action of the other departments of the Government unless such action was clearly unconstitutional, and has repeatedly quoted on this point *Ogden v. Sanders* (U. S. Supreme Court), 12 Wheaton, at p. 270, in which it was held that the highest Court in the Union would not even hold a State act unconstitutional as in violation of the Federal Constitution unless it were so "beyond all reasonable doubt." This is the considerate language of that high Court: "It is but a decent respect due to the wisdom, integrity, and patriotism of the legislative body, by which any law is passed, to presume in favor of its validity until its violation of the Constitution is proved *beyond all reasonable doubt.*"

Ought not this Court to follow what we have so often quoted and approved, and out of a "decent respect to the wisdom, the integrity, and the patriotism of the legislative body" hold that the violation of the Constitution by that body in this case "is not proved beyond all reasonable doubt"?

This position had its origin in the Roman civil law. Its duties were, and still are, like those of a stenographer, with power only to certify the evidence taken down or acknowledgments made of instruments. The notary public has no legislative, executive, or judicial authority. He

cannot even probate a deed, but merely certifies its acknowledgment
(*White v. Connelly,* 105 N. C., 65), though it is held that even a deputy
clerk, who can probate it, is not an officer.

The Attorney-General of the State, in this very case, appearing in
open Court, admitted the validity of this statute. The Attorney-General
of the United States has said in an official opinion that "commissioners
of affidavits, *notaries public,* and lawyers" are not public officers, and
this Court in an unanimous opinion affirmed that ruling and have acted
upon it ever since as to the other two positions. Why overrule it now
as to notaries public alone? The Attorney-General of Great Britain
says that the law does not disqualify women from being notaries public.
Why should we disqualify them? In all the other States' and territories
of the Union, except ten, women are admitted to be notaries public. In
our own State the Revisal, 3349, permits the clerk of the court to be a
notary public, which he could not be if it was an office, and this Court
held, as above stated, that he was a valid notary public where the valid-
ity of a mortgage under a United States statute required the instrument
to be acknowledged before a notary public. In the ten States not per-
mitting women to be notaries public there is no statute permitting them
to be.

If any opinion I have ever written, when the statute as to notaries was
different, could be fairly construed as opposed to what is herein said by
me, under the present statute, it would not be an estoppel to hold cor-
rectly in this case. Besides, I have no pride of opinion that compels me
to prefer former opinions, if erroneous, to doing justice now. I have
never deemed myself infallible, but hold that all judges should be glad of
opportunity to correct their mistakes. We should grow wiser with the
years; otherwise, experience is of no value. The infallibility of judges
is not an American doctrine, nor indeed is it held anywhere.

Under changing conditions, due largely to the introduction of ma-
chinery, women are forced to seek new and wider employment. The
Legislature, recognizing this, and learning that in some quarters there
was opposition to their receiving fees in the purely clerical work of a
notary public, owing to some passing references to the position as an
"office" in two or three decisions, passed an act making the position
merely "a place of trust or profit," and not an office, and specifically
authorizing the Governor to appoint women. This was purely a political
question, and the Legislature was acting with an intelligent understand-
ing of changed economic conditions and in a humane desire to do justice
to a deserving class, and with full recognition of their obligation to
observe the Constitution. The Governor was "authorized," not "re-
quired," to appoint women. He is one of the foremost lawyers of the
State, with the intelligence, firmness, and patriotism to know and main-
tain the limitations of the Constitution. He appointed the plaintiff to

this position. The judge of the lower court, sworn also to obey the Constitution, and a learned lawyer, held that it was no violation of the Constitution for the Legislature to so enact. Our Attorney-General, who brought this action, stated on the argument, after fuller investigation, and also in writing his opinion that the action of the Legislature is constitutional.

Ought this Court, by three votes to two, hold that this action of the executive department and of the Legislature and by the other judicial officers who have passed upon this matter has been beyond question a violation of the Constitution, and that, too, without specifying the provision of the Constitution that has been so dangerously and alarmingly violated when the Legislature has permitted women working for a living to earn a few needed fees by authorizing them when taking down and certifying evidence merely to authenticate their certificates by adding the impression of a seal? The statute provides that such impression of a seal does not make the position an office.

It has been urged, however, that fees are paid for impressing the seal! "Ay! there's the rub." Women are not voters, and there are those who think that fees should be reserved exclusively for voters, in recognition of their services. But these fees are not paid by the State or county, but by individuals, and notaries receive no salaries.

It was held in *Brown v. Turner,* 70 N. C., 100, that the position of Public Printer, worth many thousands of dollars, which the previous statute had made an "office," was reduced to the grade of a "place" because the Legislature said so, though the effect was that a Republican Court thus admitted the validity of the act of a Democratic Legislature in filling the "place" with a Democrat when the Republican Governor, holding it to be an "office," had appointed one of his own party.

In *S. v. Smith,* 145 N. C., 476, this Court held that a public administrator who has a term of eight years, gives bond, and takes an oath of office (Rev., 19) is a mere "place" and not an "office," *Brown, J.,* quoting from *Chief Justice Marshall,* saying that "Although an office is a public employment, it does not follow that every public employment is an office." *S. v. Smith* was cited with approval by *Allen, J.,* in *Boynton v. Heartt,* 158 N. C., 490.

The Constitution of this State does not prohibit the Legislature from admitting women to any office. The prohibition is just the opposite, and merely forbids any one who is a voter from being disqualified to hold office. *S. v. Bateman,* 162 N. C., 591.

Even if every position created by the Legislature, however small, could be held to be an office, notwithstanding legislative enactment to the contrary, the Constitution of this State has never made the requirements for voting and for holding office the same. Prior to 1868 the Constitution imposed the ownership of property as a prerequisite for certain

offices. The Constitution of 1868, discarding all that, imposed the sole limitation upon the Legislature that no voter should be disqualified to hold office, with the exceptions therein named; which exceptions do not name women.

Singularly enough, the majority opinion in this case quotes from a judge who was a woman (Portia), when she held that Shylock's demand of a "pound of flesh" must be granted, because else the ruling would be "recorded as a precedent," etc. It will be recalled, however, that she almost immediately reversed that ruling, to which she had been over-persuaded, and rendered a just judgment on the merits. That case has been famous for ages as showing the competency of a woman for judicial position, in that she administered justice and was superior to the superstition that erroneous precedents are more sacred than justice. A woman herself, Judge Portia certainly did not intend that her decision should be quoted as authority that a woman could not be a notary.

The General Assembly has all the powers of legislation that the people themselves have, unless restrained by some provision of the Constitution. Cannot the Legislature of a sovereign State provide that the function of authenticating a certificate or acknowledgment or protest by making the impression of a seal on paper shall be a "place" and not an "office"? And that women may receive the fees for such work, if appointed?

The feudal and medieval theory as to women—"half angel and half idiot"—meant in practice that those above the necessity of work might be on public occasions spoken of as if "half angels," but that all classes of them, and all the time, were treated as at least "half idiots" and without legal rights. If married, they were submerged in the existence, and under the power, of their husbands, who had the right even to chastise them at will. This last right persisted in North Carolina down to 1874, when *Settle, J.,* in *S. v. Oliver,* 70 N. C., 61, said the courts had "advanced from that barbarism"—thus overruling the then recent cases of *S. v. Black,* 60 N. C., 262; *S. v. Rhodes,* 61 N. C., 453, and others. In all progressive communities feudal ideas have passed, or are passing, and women are held to be human beings, entitled to equal rights with men.

There is but one question in this case, "Can this defendant discharge the duties of a notary when so authorized by an act of the Legislature and commissioned by the Governor? Or is she barred because she is a woman?"

Under the Constitution of the United States no one is debarred from holding any office, from President down, because of sex. What provision of the State Constitution will be shattered, and what detriment will the public welfare receive, if by legislative and executive authority a woman shall authenticate a certificate, made by herself, by impressing the seal upon a piece of paper?

If the plaintiff were a man he would not be debarred from holding this appointment unless he were an idiot, a lunatic, or a convict. The Legislature, voicing the sentiment of the people of the State, have enacted that it is neither a crime nor a defect in this appointee to discharge the clerical duties of a notary public because she is a woman. Shall the Court hold that it is?

BROWN, J., dissenting: I concur in the opinion of the Court except as to the conclusion that the position of notary public is a public office. Therefore, I hold that a woman may well fill such place.

While I think the weight of authority is that it is a public office, there is some decided conflict of opinion upon the subject, and as I think it is a position a woman may well fill, I do not agree to the judgment rendered.